UNIVERSAL CHURCH OF JESUS CHRIST, INC., AND DONA SLY, DIRECTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Universal Church of Jesus Christ, Inc. v. Commissioner
Docket No. 5759-82X.
United States Tax Court
T.C. Memo 1988-65; 1988 Tax Ct. Memo LEXIS 91; 55 T.C.M. (CCH) 144; T.C.M. (RIA) 88065; February 23, 1988. *91 Held: As petitioner Church was operated for other than exempt purposes, it is not an organization described in section 501(c)(3) and not exempt from taxation. Lowell H. Becraft, Jr., for the petitioners. Linda J. Wise, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Petitioners, the Universal Church of Jesus Christ, Inc. (Church), and its director and chief trustee, Dona H. Sly (Sly), petition this Court for a declaratory judgment pursuant to section 7428 [1] and Rule 210 that the Church is an exempt organization as described in section 501(c)(3) and that respondent's revocation of its tax exempt status dated December 16, 1981, and effective as of May 1, 1975, be declared null and void. FINDINGS OF FACT Some of the facts have been stipulated and are so found. [2] The stipulation and attached exhibits are incorporated herein by this reference. The Church was incorporated in Etowah County, Alabama, and exists under the laws of the State of Alabama. Sly *92 was at all times relative to this proceeding a resident of Etowah County, Alabama. On January 1, 1975, the Church was granted Charter Number 10,951 by the Universal Life Church, Inc., of Modesto, California. A statement required to be filed with the Universal Life Church showed the Church's pastor as W. L. Reed (Reed), its secretary as Jo Ann Sly, and its treasurer as Juanita C. Reed. [3] Sly's name also appeared on the report where he was given the title of Reverend. On March 11, 1975, the Church filed its Application for Recognition of Exemption with respondent's office in Jacksonville, Florida. *93 The application was signed by Reed whose title was given as "Rev." The other officers of the Church were the same as those stated above, although Sly was designated assistant pastor. The purpose of the Church, as stated on the application, was to operate a church and conduct services. The Church was to receive funds from tithes and offerings, although at the time it sought exemption, no fund-raising programs had been initiated. The application disclosed that services were initially conducted in Reed's home. On April 7, 1975, respondent's exempt organization determination group in Jacksonville requested additional information from the Church. This request included but was not limited to a corporate or other charter, bylaws, a proposed budget for the next two accounting periods, a description of activities, past, present, and future, and copies of any literature which the Church had distributed. At a business meeting held on April 11, 1975, the members of the Church unanimously approved a constitution, declaration of faith, church covenant, and church bylaws. Copies of these documents were sent to respondent's exempt organization determination group on that same date. On April 25, *94 1975, respondent sent the Church a second request for additional information. This request sought information concerning disposition of the Church's assets upon dissolution, and informed the Church that none of its organizational instruments limited its powers as required by respondent's regulations. On May 1, 1975, the trustees of the Church, William L. and Juanita Reed, and Sly adopted a "Certificates of Trustees for Incorporation of Universal Church of Jesus Christ" which satisfactorily addressed respondent's concerns. On June 2, 1975, respondent issued a determination letter granting tax exempt status to the Church as of May 1, 1975. Sly was elected a pastor of the Church on February 21, 1975. At a special business meeting held the next day, the members of the Church resolved that all expenses of and provisions for the pastor and assistant pastor including a residence, all utilities, food, membership dues to clubs, automobile expenses, and clothes would be paid by the Church. Sly was the only pastor that ever received any such benefits. He did not, however, receive a salary. Sly considered all of his expenses to be Church related since he considered himself as spending 100 *95 percent of his time on Church business. These expenses were presented to and paid from a Church maintenance account set up at the Coosa Valley National Bank in Gadsden, Alabama. Personal expenses of Sly and his family paid from this maintenance account in 1976 included the following: Payee
Amount
Jessie B. Sharp
(mortgage on residence)
$ 2,786.64
Alabama Power Co.
501.54
Southside Water Board
90.87
South Central Bell
690.78
Franklin Life Insurance Co.
(Sly insured, Jo Ann Sly
beneficiary)
866.01
Master Charge
2,620.73
Bankamericard
715.84
Woolco (Woolworth)
185.48
John Hamilton, MD
117.40
Phillips Petroleum
608.58
Texaco
30.10
Cities Service Oil
344.22
Shell Oil
177.78
Union 76
24.85
Allstate Insurance Co.
174.00
Beard's Florist
33.00
Aetna Life and Casualty
153.00
Standard Oil
30.17
Lakeland Lodge
18.65
Jo Ann Sly
595.00
Dona H. Sly
50.00
Total
$ 10,814.64 During 1977, the Slys' personal expenses paid out of the maintenance account included: Alabama Power Co.
$   343.70
Allstate Insurance Co.
185.00
Jessie B. Sharp
2,554.42
Southside Water Board
111.59
Union 76
273.03
Charles Marchant, MD
100.00
Sears, Roebuck & Co.
144.86
Bill Noah's Garage
197.32
John Hamilton, MD
10.06
Bankamericard
2,124.83
A-1 Ambulance
40.00
Cash
270.00
Scottish Masons
16.00
Chevron
177.37
Standard Oil
97.41
Woolworth
160.96
Lakeland Lodge
28.65
Phillips Petroleum
30.00
Texaco
120.48
Citgo
154.52
Carpet City
305.06
Cities Service Oil
191.94
Baptist Hospital
100.00
Jo Ann Sly
250.00
Total
$ 7,987,20
The *96 Church originally had four members, Dona and Jo Ann Sly and William L. and Juanita Reed. After the Church's organization, meetings were held on at least a weekly basis in either the Sly or Reed home, with the number present ranging from 5 to 22. The Church acquired two improved lots in Ohatchee, Alabama, on June 25, 1975, and acquired adjacent lots on July 7, 1976, and December 10, 1976. The latter had been owned by the Reeds since July 24, 1975. On these lots stood four buildings, two of which were named the Commerce Building and the International Building. The building in which church services were conducted was given the name Universal Building while an old post office was given the name Federal Building. Shortly after the Reeds' purchase of the building and lot [4] *97 in July 1975, the Church began to hold services and other religious exercises such as weddings in the Universal Building. However, for several years prior to trial, the Church met in the Slys' home due to the Universal Building's state of disrepair. On December 28, 1977, respondent sent the Church a questionnaire requesting information in order to determine if it continued to meet the requirements for tax exempt status. [5] *98 This correspondence requested much the same information as was requested preceding respondent's initial determination. Sly's response on behalf of the Church dated January 25, 1978, was found by respondent to be inadequate. In correspondence dated May 4, 1978, respondent sent a second, more specific questionnaire. In his response, dated June 27, 1978, Sly voiced his concern that the Church's constitutional rights were being violated and asked respondent for his authority and reasons for asking each question on the questionnaire. As a result of this continued failure to provide the requested information, respondent on December 21, 1978, notified the Church of his intent to inspect the Church's books as provided in section 301.7605, Proced. and Admin. Regs. Respondent scheduled the examination to take place on February 13, 1979. On that date, Sly refused to permit respondent's agent, Jerry L. Shaw (Agent Shaw) to inspect the Church's records, whereupon Sly was served with a summons to appear and produce the requested records on March 5, 1979. Sly then executed a document purporting to convey all the Church's records to Agent Shaw, but not permitting the records to leave Church premises. As a result of the examination, Agent Shaw requested technical advice from respondent's National Office. [6] By Agent Shaw's letter and copy of such request, the Church was advised that it should notify respondent within 10 days if it disagreed with any of the facts in such request. Sly timely responded with the Church's points of disagreement on October 9, 1980, and indicated that he wished a conference to be held in respondent's National Office. No *99 such conference was ever held, and by letter dated December 16, 1981, the Church's tax exempt status was revoked retroactively to May 1, 1975. Bureau of Collections
Sometime in 1967 or 1968, Sly or Benny Moore (Moore) formed a Tennessee corporation called Bureau of Collections, Inc. (BCI). BCI's main office was in Chattanooga, Tennessee. BCI was a collection agency licensed in as many as 35 to 40 states. Although BCI's many licenses to do business created the appearance of an extensive collections network, these licenses were merely to protect the corporate name and consisted of no more than an agent for service of process in most locations. Sly was a 60-percent shareholder of BCI, Moore holding the remaining 40 percent. Sly occupied the positions of sales director and president of BCI. [7] In his capacity as sales director, Sly hired and trained personnel to solicit clients for BCI. These persons, called international consultants, either approached potential clients without prior contact or followed up on leads from BCI's mass mailings, which were made by D & B Advertising Inc. (D&B), a company owned by Sly in Lakeland, Florida. BCI was D&B's *100 only customer, and the only service performed was the typing of labels for BCI's mass mailings. BCI employed [8] up to 15 international consultants between its organization and 1975. Much of Sly's time was involved in traveling to recruit persons for this position. BCI also had four or five regular employees. BCI's letterhead displayed in its upper right-hand corner an older man in a judge's robe with an uplifted gavel. In this figure's background were the scales of justice. This logo was registered in April 1968 under trademark 924884 with the United States Patent Office. The letterhead also indicated that BCI had offices in Washington, D.C.; Dallas, Texas; Atlanta, Georgia; St. Paul, Minnesota; Chicago, Illinois; Chattanooga, Tennessee; Philadelphia, Pennsylvania; and Cincinnati, Ohio. However, other *101 than being licensed in several states as described above, BCI had an operating office only in Chattanooga, with post office boxes in Washington, D.C. and Lakeland, Florida. BCI's operation was highly computerized. Computer generated letters were sent out automatically to persons whose accounts had been referred to BCI by a client. Thirty days after an account's referral, it was listed with Who's Due in America, a credit-rating business created by Sly. BCI's correspondence with active accounts consisted of a series of computer-generated letters over fictitious signatures. The first letter in this series gave the impression of having been sent from a credit manager, the second from a regional director, and the third from a national director. One letter in the series was entitled "Notice of Certification" and stated that the debtor was ordered to appear at the creditor's address "where debtor will be served with notice of intent to obtain judgment, levy, or attachments as may be legally applicable in the state where the debtor resides." BCI's compensation came in a number of different forms. A new client was charged an initial registration fee of $ 180, a portion of which went to *102 the international consultant responsible for the generation of the account. [9] Clients of BCI were charged a monthly fee of $ 5. BCI also received a percentage of the debt collected which ranged from 20 percent to 50 percent. Part of the cost of collection was to be imposed upon the debtor; BCI's literature stated that "Since the debtor is usually the one which has broken the agreement, it is only reasonable that the penalty and cost of negotiating a new agreement should be charged to the debtor." This additional charge was 25 percent of the outstanding balance, with a minimum of $ 10.00. However, BCI would not attempt to collect an amount beyond the amount of the debt plus interest and other legally collectible fees and charges. On December 16, 1974, BCI's license was revoked by the Tennessee Collection Service Board. In revoking BCI's license, the Board found as follows: the Board finds that the use of fictitious names and the corresponding use of titles of high executive positions is calculated to suggest that the letters are used for the purposes of pressuring debtors and suggesting to debtors that his failure to pay *103 has come to the attention of a national officer. This practice is deceptive in this case. * * * The evidence at the hearing revealed another deceptive usage by the Bureau of Collections that leads to the deception of a debtor and the general public. In its letters to debtors, the letterhead shows a person who is dressed in judicial garb with a gavel in his hand and the scales of justice behind him. Such a letterhead gives the appearance and color of a judicially sanctioned document and activity. The use of the terms "notice of certification" and "written notice of an attempt to obtain judgment, levy, or attachments that may be legally applicable in the state", on the above-described letterhead is a deplorable and deceptive practice for a collection agency. Although witnesses for the Bureau denied any legal significance to the use of such letterheads and language, the Board finds that a reasonable person in the collective service business would or should have recognized the peculiar significance and deceptive nature of the fictitious title; the judicial letterhead; and the language in the Bureau's letter to debtors. Collectively and individually, the circumstances presented here *104 give rise to the grossest violations of the statutes, rules and code of ethics that govern this industry. * * * Despite the Board's revocation of BCI's license, BCI stayed in business until September 1976 and operated from the Federal Building in Ohatchee, Alabama. Around the first of September 1976, the Church established its Bureau of Collection Department (BCD). A document purporting to establish this department of the Church was filed with the probate court of Calhoun County, Alabama on September 1, 1976. That document represented the purpose of BCD to be: To mediate between debtors and creditors where delinquency, contested claims, misunderstandings, performance failures, or any other condition alienating one person from another may exist. * * * [BCD] shall use all available methods to seek out people with debt problems and help restore peace of mind by attempting to mediate differences presented to [BCD] with as much wisdom as God shall grant to promote moderation and fair dealing as we are instructed in Philippians 4:5 through 9. * * * The Church hereby makes known to all men by these present, that it has purchased for $ 1.00 and other valuable considerations, all of the *105 assets, trade marks, service marks, contracts, and good will from the Bureau of Collections Inc., a Tennessee Corporation, and makes the entirety of this purchase available to [BCD] for the purpose of mediating differences through the principles taught to us by Jesus Christ in Matt. 7:12. Although BCD was intended to be entirely self-supporting, its establishment document provided that it could receive funds from the Church. [10] BCD was to have a specially-appointed director to serve on a perpetual basis; however, BCD was to be administered by the Universal Christian Mediation Council which was organized by the Church on March 14, 1977, and was directed by Sly. As was the case with BCI before its sale of assets, BCD was located in the Federal Building in Ohatchee. However, its computer facilities remained in Chattanooga, where they were also used by Little Creek *106 School. [11] The envelopes used in BCD's correspondence continued to be generated by D&B advertising but were delivered to Ohatchee for mailing. On May 9, 1977, the Church purchased all the assets of D&B for $ 1. BCD used basically the same methods of client solicitation as BCI. BCD was still represented by international consultants who by this time had an office in the International Building in Ohatchee. [12] BCD's fee schedule and structure were almost identical to that of BCI. An initial registration fee was paid, a portion of which was the international consultant's commission for generating the client. Clients were charged a $ 6 monthly fee and a portion of all debts recovered which ranged from 15 to 60 percent. A 25-percent charge was also made to the debtor. However, in contrast to the charge that was made to debtors by BCI, the charge made by BCD was not limited to interest *107 and other charges legally allowable. The reason for this charge is described in BCD's promotional literature as follows: The debtor is usually the one who has failed to live up to the original agreement and should be allowed to pay the necessary cost for a third party to negotiate a new agreement. [BCD] assesses the debtor a fee amounting to 25% of the past due or a minimum of $ 10.00.
A creditor not remitting monthly fees was no longer considered a member of BCD and no action would be taken on that creditor's behalf. Before the debtor was sent any correspondence from BCD, he was sent a "PostGram" from PostGram Services, International Building, Ohatchee, Alabama. PostGram Services was created solely to initiate contact with and notify the debtor that the creditor had requested BCD to handle the account. When this PostGram elicited no response, a series of letters was sent to a debtor again using fictitious titles or no signature at all. This first in this series of letters requested an immediate payment to "reduce the possibility of your being served with notice of intent to obtain judgment, levy, attachments, or *108 other applicable undesirable action * * *." Another letter in this series talked about forgiveness and bearing undeserved blame voluntarily, and contained a statement for the debtor to sign admitting liability for the debt. Still another letter in this series stated that BCD would negotiate for one or both parties at either's request and that the debtor was liable for a fee as described above. This letter stated that the fee does not limit or establish attorney's fees, interest, court costs, etc. Although BCD was an unincorporated department of the Church, its letterhead continued to bear the legend "incorporated for creditors protection." If the above series of letters brought no response, BCD sent a series of letters in the nature of mini-sermons to the debtors. These letters were on the letterhead of the Universal Christian Mediation Council and were signed by Sly. With the exception of the PostGram, all letters to debtors were mailed from Ohatchee, Alabama, using the Church's nonprofit organization postal permit. From April 1977 until January 1978, BCD disbursed $ 4854.46 directly to Dona H. and Jo Ann Sly. [13] *109 During 1979, an action was instituted in the Circuit Court of Leon County, Florida, by the Division of General Regulations, Department of Business Regulations of the State of Florida. The complaint alleged that BCD did not have a license to engage in business in Florida and that BCD used communications giving the appearance of having been issued or approved by a governmental agency. [14] In February 1979, an investigation into the activities of BCD was instituted by the Federal Trade Commission (FTC). Subsequently, the FTC filed suit against BCD and the Church in the United States District Court for the Northern District of Alabama. That Church issued a preliminary injunction on October 2, 1981, enjoining Sly, the Church, and BCD from engaging in activities in violation of the Fair Debt Collection Practices Act. [15] They were also enjoined from engaging in other activities found by the Church to be deceptive. The preliminary injunction was made permanent on January 10, *110 1983. On October 15, 1981, at a business meeting of the Church, it was decided to ignore the preliminary injunction as it was against the belief and purpose of the Church. [16]
Home Ambassadors
On March 1, 1975, the Home Ambassadors (Ambassadors) was established as a department of the Church. However, it was not until February 27, 1978, that an establishment document was filed in the probate court of Calhoun County, Alabama. [17] The Ambassadors's purpose was set forth in this establishment document as followed: The Agent Shaw shall encourage people to read and acquire knowledge of all types by trying to make available a wide variety of reading material wherever interest in reading or learning is found. The reading material shall not be directed to any certain age group, geographic locations, cultural heritage, or religious groups. * * * The Ambassadors shall not subject any party to the philosophies of this or any church or political groups but shall attempt to be helpful in directing inquiring individuals to something for their particular interest in order to promote *111 reading and not just reading material.
Like BCD, the Ambassadors were also to attempt to be self-supporting, but could receive financial assistance from the Church. Sly was elected head of this new department beginning February 1, 1978. [18] Sly was originally the sole director, although the Ambassadors' establishment document provided that a three-person board of directors was to be in place by August 1, 1978. Sly was assisted in managing the Ambassadors by Paul and Dixie Ramage who maintained a post office box for the Ambassadors in Washington, D.C.[19] *112 Although Paul Ramage was to submit periodic reports to Sly concerning the Ambassadors' activities, there was no correspondence between Sly and the Ramages addressed to or received from Paul Ramage; rather all correspondence was to or from Dixie Ramage. The Ambassadors sought to accomplish its purported purpose by selling magazine subscriptions door-to-door. As solicitors, the Ambassadors recruited young adults and handicapped persons although its recruiting was not limited to such persons. These solicitors would attempt to get individuals to make a nonrefundable contribution of 30 to 50 percent of the price of a magazine subscription. The Ambassadors' subscription order form contained a place for the entry of both the contribution and the subscription amount. The buyer would remit the contribution portion directly to the solicitor and was informed by the solicitor of the deductibility of the contribution portion only. It was then left to the customer to send the subscription price to the publisher or clearing house in order to begin receiving magazines. [20]
The Ambassadors had solicitors *113 and did business all over the United States. Prior to soliciting in a given state, Sly would contact that state's revenue authority requesting information and forms to enable the Ambassadors to conform to any requirements which must be met before engaging in such activity. Sly also made relevant inquiry of the Better Business Bureau in various cities. Sly soon began to receive complaints regarding unfulfilled subscriptions and even instances of theft. Most of these complaints were on behalf of purchasers by consumer protection divisions of various state's attorneys general. Sly personally responded to all complaints in a manner seeking to deflect any allegations of improper conduct. On or about July 13, 1978, Paul Ramage resigned, and shortly thereafter the Ambassadors became inactive.
Better Business Bureau of Calhoun and Etowah Counties
On July 20, 1976, the Church filed a document with the probate court of Calhoun County purporting to establish the Better Business Bureau of Calhoun and Etowah Counties (Bureau) as a department of the Church. The purpose of the Bureau, as set forth in that document, was as follows: The Bureau shall serve all peoples and all businesses by handling *114 any and all business complaints, suggestions and comments in an understanding and compassionate manner in making sure all parties involved are made aware of all sides of such complaints, suggestions and comments. The Bureau shall make available to any person or business, a consultant to privately and confidentially discuss business problems, plans and proposals. The Bureau shall act as a unified lobby to present ideas and complaints of the business community to our elected officials for their consideration for the enactment of our laws. The Bureau shall assist in obtaining and sharing information concerning businesses, products, services, and the people involved in such, regardless of the originating location of such. The Bureau shall seek to increase efficiency and numbers of people involving themselves in business. The Bureau shall assist, where possible, in arranging needed financing for established or proposed businesses by gathering and presenting needed information concerning experience and attitude, to interested financial institutions. The Bureau was to be self-supporting from dues, fees, and donations. [21] A board of directors of not less than three people was to be elected *115 by the Bureau membership with the first election to be held on July 1, 1977. [22] Until that time, Sly was elected sole director and manager to serve without benefit of a board. To sustain its activities, the Bureau relied upon monthly contributions from member businesses. Shortly after its formation, the Bureau and Sly were named defendants in a trademark infringement suit brought by the Council of Better Business Bureaus (Council), and the Better Business Bureau, Inc. (BBB). In entering a consent judgment, the U.S. District Court for the Northern District of Alabama found that Sly and the Bureau infringed the trademarks of the Council and BBB "by using, advertising, and promoting the marks BETTER BUSINESS BUREAU and BBB as trade and/or service marks in connection with services of a confusingly similar nature to plaintiff Council of Better Business Bureaus, Inc. without consent or authorization." That court's consent judgment enjoined Sly and the Bureau from infringing in any way upon *116 the trademarks of the Council or BBB. The consent judgment was signed for the defendants by Sly individually and Bobby Jones on behalf of the Church. [23]
On September 7, 1977, that court made findings of fact and conclusions of law based upon the evidence presented to it upon the motion of the Council and BBB to hold Sly and the Bureau in contempt for not complying with the consent judgment. The court found that the enjoined acts had continued unabated from the date of entry until the date of the hearing on the motion for contempt. The court further found that the attempt of Sly and the Church to make a gift of the Bureau's assets to the Council was a nullity and even though Sly thought he had made a valid gift and was continuing to run the Bureau as an agent for the Council, such a belief was not reasonable. Sly and the Church were therefore found in contempt but were allowed to purge themselves of such contempt by complying with the consent judgment. [24] *117 Christian Health Care Plan
On May 16, 1977, the Christian Health Care Plan (CHC) was established by the Church. However, CHC did not begin active operation until 1981 when John Dilley (Dilley), a member of the Church, requested that it be reactivated. It was started in Illinois where Dilley was then a resident. CHC used a plan devised by the Seventh Day Adventists as a model. A brochure was made available to those seeking to enroll in CHC. The brochure stated the plan's operation as follows: How does it work? Each month the actual medical expense incurred for hospital care among registered contributors is determined for two separate groups. Group #1, includes children under 18 years of age, Group #2, includes adults age 18 and over. The amount of money actually used to pay the medical costs and administering the plan, plus 10% of total expenses, is divided equally among all registered contributors in each group monthly, and a notice sent to each of the registered contributors. Contribution for the amount needed must be paid by each contributor within 30 days. When a registered contributor is hospitalized for treatment (No limitations *118 as to room cost or other hospital incurred expenses), the bills will be paid in full by other registered contributors through this Christian Health Plan.
The minimum financial requirements were $ 10 per month for adults and $ 3 per month for children, although new members must contribute twice as much as other members for the first 12 months of membership. The plan did not pay if a contributor had other insurance or if Government assistance was available. No medical bills would be paid for any month in which contributions were not made and for 2 months after contributions resumed. The brochure sent to prospective plan enrollees represented that contributions were voluntary and deductible just as any other charitable contribution under the guise of helping others with medical bills. Membership in the Church was required for a person to become a member of the plan. On January 5, 1982, a cease and desist order was issued by the Illinois Director of Insurance requiring the Church to discontinue its CHC operations. The case was assigned to a hearing officer who on May 13, 1982, made findings of fact and conclusions of law recommending that the director's cease and desist order remain *119 in effect until Dilley and the Church procure a certificate of authority from the Illinois Department of Insurance. Among such findings and conclusions it was found that the Church was then engaged in the business of insurance without proper authority. It was also found that some medical bills submitted under the plan had not been paid. On May 17, 1982, the Illinois Director of Insurance ordered that his earlier cease and desist order remain in effect until the required certificate was procured. It had not been obtained by the time of the trial. [25]
Aside from the Bureau of Collections Department, the Home Abassadors, the Better Business Bureau of Calhoun and Etowah Counties, and the Christian Health Care Plan, the Church and Sly contemplated several other money-making activities which never became active. Among these were two elaborate pyramid schemes, the expansion of PostGram Services to operate on a scale comparable to the U.S. Postal Service, a plan to establish a department of the Church for offering low-interest loans [26] and a plan to acquire by purchase or donation land for a project pursuant *120 to which lots would be sold on which the Church would build residential dwellings. With the proceeds, the Church was to build a community center, medical center, playground, and recreational facilities on the retained land. These enterprises engaged in by the Church were almost purely commercial and constituted a substantial, if not overwhelming portion of the Church's activities. OPINION Section 501(a) provides for exemption from taxation for organizations which meet the requirements set *121 forth in section 501(c) or 501(d). [27] The Universal Church of Jesus Christ claims exemption from taxation on the basis that it is organized and operated for religious purposes as described in section 501(c)(3). The burden of proof in this declaratory judgment action is on petitioner "as to jurisdictional requirements and as to the grounds set forth in the notice of determination." Rule 217(c)(2)(i). Section 501(c)(3) sets forth three requirements for qualification as an organization exempt from tax. In order to be granted such an exemption, the organization must show that it is organized and operated exclusively for an exempt purpose, that no part of its net earnings inure to the benefit of any private individual, and that no substantial part of the organization's activities consists of dissemination of propaganda, attempts to influence legislation, or engaging in political activities. Section 1.501(c)(3)-1, Income Tax Regs.; Bubbling Well Church v. Commissioner,74 T.C. 531, 534 (1980), affd. 670 F.2d 104 (9th Cir. 1981). Respondent contends that the Church was *122 operated for no exempt purpose, that it is not a "church" within the meaning of section 170(b)(1)(a)(i), and that the Church's net earnings have inured to the benefit of its pastor, Dona H. Sly and his family. Respondent's regulations under section 501(c)(3) require an organization seeking exempt status to satisfy both an organizational and an operational test. If an organization fails to meet either test, it is not exempt. Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. The organizational test set forth in section 1.501(c)((3)-1(b), Income Tax Regs., is relatively easy to satisfy in that it concerns requirements to be met before the organization engages in any activity. This test in essence requires that the articles of organization limit the activities to one or more exempt purposes and do not expressly empower the organization to engage in activities not in furtherance of such purposes. We find that the Church has met the organizational test. [28]
The second, and much more difficult test, is the operational test found in section 1.501(c)(3)-1(c), Income Tax Regs. Under this *123 test, the organization must show "that [its] activities [are] primarily those which accomplish one or more exempt purposes as specified in section 501(c)(3), and not, except to an insubstantial part, those which do not further an exempt purpose." Basic Bible Church v. Commissioner,74 T.C. 846, 856 (1980), affd. 739 F.2d 265 (7th Cir. 1984); Copyright Clearance Center v. Commissioner,79 T.C. 793, 803 (1982); BSW Group, Inc. v. Commissioner,70 T.C. 352, 356-357 (1978). The regulations under section 501(c)(3) not only require an organization to be operated for one or more exempt purposes, but require that organization to be "operated exclusively" for such purposes. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. However, "An organization which engages in nonexempt activities can obtain and maintain exempt status so long as such activities are only incidental and less than substantial." Church in Boston v. Commissioner,71 T.C. 102, 107 (1978). The extent to which an organization may engage in such nonexempt activities without losing its tax exempt status was set forth by the Supreme Court in Better Business Bureau v. United States,326 U.S. 279 (1945), where the Court stated that "the *124 presence of a single [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] purposes." [29]Better Business Bureau v. United States, supra at 283. Neither is an organization organized and operated exclusively for one or more exempt purposes unless it serves a public rather than a private interest. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. If a nonexempt purpose is not an expressed goal, courts will look at the manner in which the organization's activities are conducted, *125 inferring an end from the chosen means. Factors to which the courts will look are the manner in which the organization conducts its activities, the commercial nature of such activities, and the existence and amount of annual or cumulative profits. The existence of any of these factors supports a conclusion that an organization was not operated exclusively for an exempt purpose. Church of Scientology of California v. Commissioner,83 T.C. 381, 475 (1984), affd. 823 F.2d 1310 (9th Cir. 1987). An examination of the activities of the Universal Church of Jesus Christ and a weighing of the relevant factors convinces us that not only were the nonexempt purposes for which the Church was operated substantial, but they were the primary reasons for the Church's existence. The Church operated four commercial activities as departments, the Bureau of Collections Department, the Home Ambassadors, the Better Business Bureau of Calhoun and Etowah Counties, and the Christian Health Care Plan. We can reach no conclusion but that these enterprises are primarily commercial in nature. In the case of BCD, we are afforded a predecessor enterprise (Bureau of Collections, Inc.) against which to judge the *126 commercial nature of its activities. We note that BCD continued to use BCI's letterhead, maintained a fee schedule similar to BCI's, continued to charge a fee to the debtor, and continued to send letters calculated to intimidate debtors by threatening legal action which either could not or would not ever have been initiated. [30] *127 *128 We therefore find that BCD was no less than what its name represented it to be: a debt collection business operating under the thinnest of veils in an attempt to give itself the appearance of a religious enterprise, even going so far as to use the Church's nonprofit organization mail permit in its commercial activities. The Church's other activities are imbued with no less a commercial hue. The Home Ambassadors was merely a magazine subscription service relying to a certain extent upon deceptive forms of solicitation. The Church urges us to bifurcate its solicitation practices into the solicitation of contributions to the Church and purchase of a magazine subscription, each independent of the other. However, we are persuaded that these transactions took this form so that the Ambassadors' profits might appear to the customer to be a tax deductible charitable contribution. Furthermore, the Ambassadors did not solicit subscriptions to publications solely or even *129 primarily of a religious nature; in fact its stated aim was to the contrary. Also, the element of deception, as is evidenced by the large number of consumer complaints, discounts any religious purpose. The Church has utterly failed to show that the Ambassadors' activity was in furtherance of any exempt purpose. Much the same can be said for the Better Business Bureau of Calhoun and Etowah Counties and the Christian Health Care Plan. The Bureau operated with many of the same ideals as a legitimate Better Business Bureau. Its stated purpose was to foster and promote successful businesses in Calhoun and Etowah Counties, Alabama. [31] *130 The CHC was no more than an oversimplified health insurance plan, contributions to which were represented as deductible and used to help others pay medical bills. [32] In fact, only members of CHC whose payments were current could present their medical bills to CHC for payment. Medical expenses covered by CHC were simply to be spread among its members, causing "premiums" to fluctuate widely depending upon the plan's monthly liabilities. We fail to see any exempt purpose behind these activities. Through his testimony, Sly sought to impress upon us his religious convictions and the religious nature of the enterprises run through the Church. He seeks to persuade us that BCD is merely a service to mediate disputes between debtor and creditor, helping to remove the enmity between them and bring them closer to God. Sly also states that Ambassadors is intended *131 to get good reading material into the home, that the Bureau acts as a mediation service to help resolve business disputes, and that CHC was to ease the burden of medical bills. We need not decide whether Sly's characterization of the purposes behind each of these organizations are exempt purposes, for we are not convinced by his testimony. The documentary evidence to which the Church has stipulated is in many cases not entirely consistent with Sly's testimony, and while we are not convinced that various establishment documents and descriptive brochures go far enough in describing the Church's commercial activities, they more accurately represent the true nature of those activities than do Sly's oral representations. Having been satisfied that the Church's commercial activities are substantial and indeed pervasive, the extent to which the Church carried on religious services and activities becomes irrelevant. Cf. Church of Eternal Life v. Commissioner,86 T.C. 916, 924 (1986). We find no error in respondent's revocation of the Church's tax-exempt status based upon the presence of such substantial, nonexempt purposes. Nor is the Church's failure to meet the operational test of the *132 regulations under section 501(c)(3) the only ground upon which tax exempt status may be denied. An organization is not described in section 501(c)(3), and is not entitled to tax exempt status if any part of its net earnings inure to the benefit of a private individual. Inurement as contemplated by the statute is not limited to distribution of net profit as dividends. Unitarian Mission Church v. Commissioner,74 T.C. 507, 512-513 (1980), affd. without published opinion 647 F.2d 163 (2d Cir. 1981); Lowry Hospital Association v. Commissioner,66 T.C. 850, 857 (1976). Section 501(c)(3)'s prohibition is absolute, and "no part" of an organization's earnings may so inure. Unitarian Mission Church v. Commissioner, supra at 513. Further, "While the payment of reasonable salaries does not indicate private benefit, the payment of excessive salaries does result in inurement. [Citations omitted.] The question of reasonableness of salaries is a question of fact." Unitarian Mission Church v. Commissioner, supra at 514. The Church has failed to come forward with evidence sufficient to show that sums paid to or on behalf of Sly and his family constituted a reasonable salary rather than inurement *133 to their benefit as private individuals. Therefore, the burden of proof imposed upon the Church by Rule 217(c)(2) has not been met. Sly was the only pastor or member of the Church to have his living expenses paid, and even though he received no salary qua salary, he received cash from both the Church's maintenance account and BCD's account. Prohibited inurement is strongly suggested when an individual with control over an organization's affairs, or his family, is the principal recipient of the organization's disbursements. Cf. Church of Eternal Life v. Commissioner,86 T.C. 916, 927 (1986); Basic Bible Church v. Commissioner,74 T.C. 846, 857 (1980). Finally, we find that respondent was correct in revoking the Church's tax exempt status retroactively to May 1, 1975. While the first of the Church's commercial enterprises, the Better Business Bureau of Etowah and Calhoun Counties, did not begin operating until at least July 1976, the Church has presented no evidence upon which we might base a finding that prior to that time it was operated for exempt purposes or that its net earnings did not inure to the benefit of Sly and his family. We have found that the Church made specific *134 payments to and on behalf of the Slys during 1976 and 1977. Neither party has introduced such detailed records for 1975, if indeed any exist. However, on February 22, 1975, one day after Sly's election as pastor, the Church resolved to supply him with a residence and all living expenses. Given this fact, we think it reasonable to find that private inurement began on that date, over 2 months prior to respondent's retroactive revocation. The Church has made no attempt to discharge its burden of proving otherwise. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Ordinarily, the disposition of a declaratory judgment action will be made solely on the basis of the administrative record. However, "Disposition of an action for declaratory judgment involving a revocation may be made on the basis of the administrative record alone only where the parties agree that such record contains all the relevant facts and that such facts are not in dispute." Rule 217(a). The parties have not so agreed, and our findings of fact extend beyond those stipulated to be a part of the administrative record. ↩
3. Jo Ann Sly and Juanita C. Reed are the wives of Sly and Reed. ↩
4. The parties have stipulated that it was upon this particular lot that the Universal Building, in which was later housed the Universal Church of Jesus Christ, was situated. 5. Such a request is in accordance with section 301.7605-1(c)(2), Proced. and Admin. Regs., which restricts respondent's authority to examine the books and records of an organization claiming to be a church to situations in which the information contained in such books and records has been sought by written request and such request has not been fully or satisfactorily complied with. Although such examination was contested, the Church has not raised the propriety of such examination in this proceeding, and we need express no opinion regarding the matter. 6. See Rev. Proc. 80-26, 1980-1 C.B. 671↩.
7. Benny Moore took a very limited role in the actual operation of BCI as he operated an independent accounting practice. ↩
8. In his appearances before various tribunals, Sly was adamant in his view that these international consultants were independent contractors as opposed to employees. We need not make such a finding here, and the term "employed" is used merely for convenience. ↩
9. International consultants worked solely for commissions. ↩
10. In response to a request for additional information in regard to its application for tax-exempt status, the Church provided respondent with its proposed budgets for 1975 and 1976. These identical budgets each contain the provision that $ 8,000 of a total budget of $ 19,404 be spent in those years on debtor's assistance. ↩
11. Little Creek School was never charged for the use of BCD's computers until BCD fell behind in the lease payments. The computer was later moved to Little Creek School which then assumed all lease payments. However, BCD would pay Little Creek for the use of the computer according to its ability to do so. ↩
12. After 1976, BCD had only one or two international consultants. ↩
13. During this same period of time, an extensive amount of activity took place involving BCD's bank account. However, the disbursements to Dona H. & Jo Ann Sly seem to be BCD's only expenditure to them or for their benefit. 14. The disposition of this action is not found in the record. ↩
15. 15 U.S.C. sec. 1692, et seq. (1982)↩. 16. The record does not reflect what activity was undertaken at BCD after that date.↩
17. Ambassadors was originally intended to send sermons on tape to the aged. This is reflected by minute-book entries in 1975. However, the record reflects little activity on the part of Ambassadors in this regard until after the establishment document was filed. ↩
18. This fact is established by the minutes of the Church's business meeting on the same date. ↩
19. The record does not reflect whether Paul and Dixie Ramage became directors of Ambassadors. However, Sly was the primary moving force behind Ambassadors and practically all, if not all, correspondence concerning Ambassadors was to him or signed by him. 20. The record does not reflect whether any portion of the amount sent to the publisher or clearinghouse was remitted to the Ambassadors. ↩
21. Unlike BCD and the Ambassadors, the Bureau's establishment document contained no provisions allowing it to accept funds from the Church. ↩
22. The record does not reflect if such election was ever held. ↩
23. Although the Church was not named a defendant in the documents filed with the U.S. District Court for the Northern District of Alabama, Bobby Jones did sign the consent judgment as its trustee. ↩
24. The record does not reflect whether the consent judgment was ever complied with.
25. The record does not reflect whether the Director's order was complied with. ↩
26. On November 28, 1978, Sly inquired of the state banking department for the State of Alabama regarding whether a license would be required for this activity. In this inquiry, he stated that the interest rate would be not more than 1-1/2 percent per month. In response to this letter, the Department of Banking informed Sly that a license would be required and that engaging in such business would probably cause the church to lose its tax-exempt status. Sly then made further inquiry to the IRS asking if this was indeed the case. However, in this letter dated December 12, 1978, Sly stated that the interest rate was to be 1 to 1-1/2 percent per year and would not exceed the legal interest rate. ↩
27. Sections 502 and 503 set forth requirements for and limitations on tax exempt status which are not applicable here. ↩
28. This was impliedly conceded by respondent upon issuance of a favorable determination letter dated June 2, 1975. ↩
29. While Better Business Bureau v. United States,326 U.S. 279 (1945), dealt with Social Security taxes, the statutory language in that case is comparable to the critical language of section 501(c)(3) and the regulations thereunder. We have repeatedly applied the test of Better Business Bureau to the issue before us. Copyright Clearance Center v. Commissioner,79 T.C. 793, 804 n. 11 (1982). Cf. Syrang Aero Club, Inc. v. Commissioner,73 T.C. 717, 722-723 (1980); Dumaine Farms v. Commissioner,73 T.C. 650, 668 (1980); est of Hawaii v. Commissioner,71 T.C. 1067, 1079 (1979), affd. without published opinion 647 F.2d 170↩ (9th Cir. 1981). 30. The record reflects, and we have found as a fact that if a client of BCD failed to remit its monthly fee or BCD's percentage of recovery (in the case when a creditor received a payment directly from a debtor), that client would no longer be considered a client of BCD, and no more "mediations" would be undertaken in that client's behalf. However, Sly was adamant in his testimony that such fees were purely voluntary and that nonpayment was no impediment to continued mediation: Q: Did the church charge fees for the things that were done in reference to this mediation service, or was it contributions? A: We had suggested fees and assessments, it was all to be paid voluntarily, and contributions. We present our brochures, we mentioned these suggested things, and the suggested tithe. In all our correspondence to them, it was constantly pointed out that we operated on strictly a contribution both from debtor and creditor. * * * Q: During your discussion about the Bureau of Collections, you stated that all the fees were voluntary, correct? A: Yes, and that is stated on the information that is provided when we send out the mailing information. Q: If, as a consultant, as an international consultant for Bureau of Collections, you go to a creditor and he says, yes, sure, I would like you to collect this for me and mediate it for me, but I do not want to pay you. Are you going to make an effort to mediate that? A: Absolutely, we have never failed to attempt to mediate a problem because they did not want to pay. As a matter of fact, most of them did not. * * * Q: Okay, if a creditor, you are already handling his account, and he quit paying his monthly fee, are you going to continue to work on his account? A: Certainly, we have never discontinued activity because of that. However, at an investigational hearing before a presiding officer of the Federal Trade Commission, Sly testified as follows: Q: Could you describe exactly how [BCD] functions? In other words, a step by step basis. What do you do in mediating disputes? A: Well, we seek out problems. Q: Members of the church or anyone? A: Members of the Department. * * * Later in the proceeding, Sly testified that: A: A member pays a fee of $ 6 a month. If he doesn't pay it he will no longer be considered a member. ↩
31. In Better Business Bureau v. United States,326 U.S. 279 (1945), the Supreme Court found that "an important, if not the primary pursuit of petitioner's organization is to promote not only an ethical but also a profitable business community." In so stating, the Court held that the Better Business Bureau was not an exempt organization. Sly testified that the difference between the Church's Bureau and the BBB was that the Bureau engaged only in mediation, while BBB engaged in binding arbitration. Even were we to accept Sly's characterization, we would find it to be a distinction without a difference.
32. Members' contributions were their pro rata share of CHC's medical and administrative costs, plus 10 percent of those costs. Presumably CHC would have no expenses other than payment of medical bills and administration expenses; its payment scheme therefore guaranteed a profit of 10 percent. ↩