**In re James Henry STERNBERG, Debtor.**

**United States of America, Appellant,**

v.

**James Henry Sternberg, Appellee.**

**Nos. 97–8833–CIV–GOLD, 95–30552–BKC–SHF.**

United States District Court, S.D. Florida, Miami Division.

Nov. 12, 1998.

Jose de Leon, Tax Division, U.S. Department of Justice, Washington, DC, for Plaintiffs.

Tina M. Talarchyk, West Palm Beach, FL, for Defendants.

## ORDER

GOLD, District Judge.

The United States appeals from a Bankruptcy Court order which found that the debtor's federal income tax liabilities for the years 1977 through 1981 were dischargeable. In the Bankruptcy Court, the United States argued that pursuant to section 523(a)(1)(C) of the Bankruptcy Code, the tax debt was not dischargeable because the debtor wilfully sought to evade payment of his taxes by transferring most of his attachable assets to his new wife as sole owner, or to himself and his wife as tenants by the entirety. On appeal from the order finding the debt dischargeable, the United States makes three arguments: (1) the evidence does not support the Bankruptcy Court's finding that there was adequate consideration for the asset transfer; (2) the Bankruptcy Court erroneously considered only the transfers made pursuant to an amendment to a prenuptial agreement; and (3) the Bankruptcy Court failed to consider the appropriate factors demonstrating fraud. After examining the record, and carefully considering the arguments of both parties, the Court concludes that the Bankruptcy Court's ruling was erroneous.

## I. FACTS

Dr. James Henry Sternberg filed a voluntary Chapter 7 proceeding in the Bankruptcy Court for the Southern District of Florida after the Internal Revenue Service (IRS) assessed substantial tax liabilities against him. When the IRS filed a proof of claim in the amount of $2,058,726.91 in the bankruptcy proceeding, Sternberg responded with a complaint seeking a determination that his debt to the IRS was dischargeable. The matter was tried before the Bankruptcy Court on February 12, 1996. Relying on section 523(a)(1)(C) of the Bankruptcy Code, the IRS argued that Dr. Sternberg's debt should not be discharged because he willfully attempted to evade or defeat his taxes by transferring almost all of his attachable assets to his new wife. Dr. Sternberg claimed he received adequate consideration from his wife for the transfer of assets. Finding the consideration adequate, the Bankruptcy Court ruled the debt dischargeable. The following facts are taken in substantial part from the Bankruptcy Court's final judgment.

**A. The Tax Liability.** Dr. Sternberg is a radiologist who has practiced in South Florida since 1974. From 1977 through 1981, he invested in a tax shelter known as Imperial Finance, N.V., a Netherlands Antilles corporation formed for the ostensible purpose of acquiring an option to lease mineral rights on certain land in South Africa. These rights were divided into "working in-

terests" which were sublet to investors. According to the sublease agreements, each working interest gave the investor rights to mine and remove diamonds in return for a minimum annual royalty payment. Dr. Sternberg made annual royalty payments in various amounts, ranging from $25,000 to $43,000 per year. He claimed tax losses, however, of amounts far greater than his annual royalty payments. In 1977, Sternberg claimed a loss of $125,170; 1979's claimed loss was $310,000; 1980's claimed loss was $200,000, and 1981's claimed loss was $175,000.[1] The IRS examined Sternberg's returns for those years and disallowed the deductions.

In March of 1985, Dr. Sternberg delivered an Offer in Compromise to the IRS offering to pay $200,000 at the time the offer was accepted, plus a percentage of his adjusted gross income over $100,000. This offer was rejected by the IRS. Later in 1985, the IRS issued statutory notices of deficiency to Sternberg for the tax years 1977 through 1981. The combined deficiency for those years was $479,777.62. Sternberg filed two petitions with the United States Tax Court contesting the deficiencies. His cases, as well as all other cases involving the Imperial Finance tax shelter, were assigned to Judge Charles E. Clapp, II, who tried two test cases related to Imperial Finance, *Fredkin v. Commissioner*, 51 T.C.M. (CCH) 865, 1986 WL 21867 (1986) and *Cheng v. Commissioner*, 51 T.C.M. (CCH) 861, 1986 WL 21866 (1986). In both cases, Judge Clapp ruled that the deductions taken by the taxpayers with respect to Imperial Finance were properly disallowed by the IRS. The *Fredkin* decision was affirmed by the First Circuit Court of Appeals on March 30, 1989. Citing to the appellate court's affirmance of his *Fredkin* decision, Judge Clapp entered orders in both of Sternberg's cases on November 1, 1989, requesting that the parties submit a decision document or show cause why a decision document should not be submitted.

**B. The Prenuptial Agreement.** Eleven months before Judge Clapp issued his November 1, 1989 decision, Sternberg married his fourth wife, Marsha May. Eleven years

younger than her husband, May worked part-time as a reporter for the *National Enquirer*, earning $56,000 a year. By the time of his marriage to May, Dr. Sternberg had retired from the practice of radiology because of problems with his vision and was receiving tax-free disability payments which started at $6,500 per month and increased to payments of $9,500 per month at the time of trial. Dr. Sternberg also earned substantial wages by managing other radiologists.

Shortly before they were married, Sternberg and May had executed a prenuptial agreement prepared by Dr. Sternberg's attorney. The purpose of the agreement was to protect Dr. Sternberg's interests in the event of a divorce. Under the prenuptial agreement, each party retained independent control and management of their separate property, and each party's separate property was to be excluded from marital assets. "Separate property" was defined to include all property owned before the marriage, including property described in disclosures that were attached as Exhibits A and B, all earnings of each party after marriage, and all rents, dividends, profits, or other income derived from separate property. Under the agreement, May would receive a sum certain in the event of divorce, and a specified percentage of Dr. Sternberg's estate in the event of his death. The couple's principal residence was to be in Dr. Sternberg's name for three years, and then transferred to both Dr. Sternberg's and May's name if they were still married after three years. Any tax deficiencies arising from periods prior to the marriage would be the separate responsibility of the party for whom the deficiency was proposed.

Exhibit A to the prenuptial agreement is a Statement of Assets and Liabilities for Dr. Sternberg. This disclosure lists assets totaling $7,013,000 and liabilities of $1,541,000 for a net worth of $5,897,000. The disclosure listed "Other Assets" worth $6,175,000, including a fifty percent ownership in a professional association valued at $500,000, and partnership or shareholder interests in various magnetic resonance imaging [MRI] centers. Also listed were reading contracts,

---

1. The tax return for 1978 was not included in the    evidence submitted to the Bankruptcy Court.

which were exclusive contracts with Dr. Sternberg's professional association of radiologists to "read" results from the MRI centers. Sternberg listed on his disclosure a contested tax liability of $1,500,000.

**C. The Amendment and Transfer of Assets.** In November 1989, just after the Tax Court entered its November 1, 1989 decision adverse to Sternberg, and only ten months after they had entered into the prenuptial agreement, May and Sternberg amended the prenuptial agreement. Under the new agreement, the property provisions set forth in the prenuptial agreement were revoked and Sternberg was required to immediately transfer certain property to May either into her name solely, or into a tenancy by the entirety. The Amendment recited that the reason for the transfers was to account for the "considerable disparity in age of the parties hereto, the potential professional liabilities inherent in Mr. Sternberg's practice of medicine, and the speculative nature of many of Mr. Sternberg's business ventures."

At trial, the IRS challenged the reasons for the transfers, arguing that the debtor made the transfers to evade payment of his taxes. The Bankruptcy Judge also expressed doubts about why the assets were transferred. He noted in the final judgment that the reasons for the transfer stated in the Amendment—age disparity, potential professional liabilities, and speculative nature of investments—were conditions that were known to the parties at the time they entered into the prenuptial agreement. Dr. Sternberg testified the Amendment was actually precipitated by his wish that May quit working, and his desire to provide May with some form of security in lieu of her decision to

terminate her employment. The IRS challenged this reason also, arguing that nothing in the Amendment reflected this intent. Significantly, although the Amendment was prepared by Dr. Sternberg's lawyer, there was no language in the agreement obligating May to quit her job nor were there any promises by May to quit her job. In fact the evidence showed that May did not quit working after signing the Amendment. She continued to work in 1990, and no evidence was presented that she ever quit working.

The Amendment contained a clause that reaffirmed the value of the parties' respective assets. Dr. Sternberg had valued his assets at over five million dollars less than ten months before the Amendment. The Amendment reiterated that those estimates were fair and adequate.[2] In accordance with the terms of the Amendment, almost all of Sternberg's attachable assets were transferred to May as sole owner, or to Sternberg and May as tenants by the entirety.[3] The only assets remaining solely in Dr. Sternberg's name were a checking account with a balance of $12,000 and an IRA valued at $6,000.

**D. The Assignments.** After the transfers were made pursuant to the Amendment, Dr. Sternberg continued to rearrange his financial affairs so that all attachable assets were in the name of May alone, or May and Sternberg as tenants by the entirety. In 1990, 1991, and 1992, several S corporations which owned and operated additional MRI centers were formed, and May rather than Dr. Sternberg was named as the shareholder.[4] May never paid any consideration for those assets. Sternberg's occupation after he retired from practicing radiology was to

---

2. "[e]ach party hereto agrees that Exhibits A and B to the Agreement, estimating as of the dates specified therein the value of the principal assets and liabilities of Mr. and Mrs. Sternberg, respectively, continues to constitute an adequate and fair disclosure to the other of his or [sic] financial situation."

3. The assets which Sternberg was to transfer outright included his one-third interest in a condominium in Park City, Utah, a condominium in Pompano Beach, Florida, and his "fee simple interest" in real property located at 17785 Deauville Lane, Boca Raton [Laurels]. The corporations in which Sternberg transferred all of his

interests and partnerships to himself and his wife as tenants by the entirety included J. Sternberg, S. Schulman Associates Corp. [Prof. Assoc.]; S.A.S.G.P., Inc.; M.R.I. of Boca Raton, Inc.; P.O.D.C., Inc.; M.R.I. of South Dade, Inc.; Askay, Inc.; Oakland M.R.I., Inc.; and Serving Tray, Inc.

4. Those S corporations included MRI of Greater Kansas City, MRI of Arlington Heights, MRI of Arlington, Virginia, MRI of Columbia, S.C., MRI of Orlando, MRI of Chicago, and MRI of River North.

manage these MRI diagnostic centers. The reading contracts which Dr. Sternberg listed as "separate property" on Exhibit A to the Prenuptial Agreement were transferred to a corporation in which only May, not Dr. Sternberg, had an interest. It is undisputed that May did not manage these assets. Evidence was presented at trial that Dr. Sternberg also assigned his income earned from managing the MRIs to May's wholly-owned corporation, Berghini Consulting Company. By contract, Berghini Consulting also received the salary Dr. Sternberg would normally have earned under Sternberg & Schulman, PA and Sternberg & Schulman Assoc.[5]

After the asset transfers were made pursuant to the Amendment, and the subsequent asset transfers made by Assignment, Dr. Sternberg filed a response to the Order to Show Cause in his Tax Court cases. The Tax Court made no decision until after the decision in *Cheng*, which was reversed in part by the Court of Appeals for the Ninth Circuit in 1991. See *Cheng v. Commissioner*, 938 F.2d 141 (9th Cir.1991) (taxpayer entitled to deductions only for cash investment in Imperial Finance). Decision documents were then entered in Sternberg's Tax Court cases. The final settlement worked out between the IRS and Sternberg disallowed all deductions except for cash-out-of-pocket for some years, in accordance with the *Cheng* decision, and total disallowance for the other years, in accordance with *Fredkin*. Consequently, Dr. Sternberg's tax liability, exclusive of interest and penalties, was $426,292 or 88.85 per cent of the amount of tax determined to be due under the notices of deficiency.

On June 23, 1994, the IRS assessed income taxes and interest against Sternberg and gave notice and demand for payment for the deficiencies as determined by the Tax Court. A few months later, Dr. Sternberg and May sold their interest in the MRI centers. The final sale price was twenty million dollars. The Sternberg's interests in fourteen MRI's

totaled 33.5 per cent, with May holding 17 per cent in her name alone and 16.5 per cent as tenants by the entirety with Dr. Sternberg.[6] As tenants by the entirety, May and Sternberg were to receive $310,333 in cash, $498,167 in short-term promissory notes, and 163,333 shares of common stock of Consolidated Technology Group. Ltd.

As part of the sale of the business, Dr. Sternberg also entered into a Professional Services Agreement which provided that J. Sternberg and S. Schulman, M.D., Corp., would act as a contractor for Dr. Webster N. Jones, a radiologist. The agreement was assigned to Sternberg and Schulman, M.D., Corp., an entity in which only May and not Dr. Sternberg had an interest by assignment dated May 1, 1994.

On February 27, 1995, 249 days after his tax liabilities were assessed, Dr. Sternberg filed for relief under Chapter 7 of the Bankruptcy Code. The IRS filed a proof of claim in the amount of $2,058,726.91 for the debtor's federal income tax liabilities from 1997 through 1981. Sternberg then filed a complaint alleging that the tax liabilities were dischargeable. The Bankruptcy Judge held a trial on February 12, 1996. Both Sternberg and his accountant, Milton Friedman, testified that the valuation of assets listed on the prenuptial agreement was inaccurate. For the purposes of the trial, Friedman valued the debtor's interest in the corporate assets transferred to May by taking the book value of the entity and subtracting from it the liabilities it owed. The documents Friedman used to prepare his valuation were the corporate income tax records for 1988. Those corporations earned revenues of approximately two to two and one half million dollars. In arriving at his valuation, Friedman said he gave very little weight to projected income. Friedman testified that the corporation known as Associates Corp. had a net loss of $15,000 in 1989, and the M.D. Corp. earned only $20,000. He did not men-

---

5. May is now the title owner of a house in Jupiter, Florida, which was purchased in 1993 for $870,000. The purchase required an $80,000 cash deposit and an $189,000 cash payment at closing. The house has a $650,000 mortgage in the name of Dr. and Mrs. Sternberg. Dr. Sternberg makes the mortgage payments.

6. Sternberg's third wife was entitled to receive $323,000 in cash, $518,500 in short-term promissory notes, and 170,000 shares of common stock of Consolidated Technology Group. Ltd.

tion, however, that in 1989, those two corporations paid Dr. Sternberg $810,929 in wages.[7] Based on new figures presented by Sternberg and his accountant, the Bankruptcy Court found that the debtor's interest in most of the corporations transferred to May pursuant to the Amendment were virtually worthless. Consequently, the Bankruptcy Court found that the transfer of assets pursuant to the Amendment was not "excessive consideration for May quitting her job. . . ."

## II. STANDARD OF REVIEW

■ In accordance with Federal Rule of Bankruptcy Procedure 8013, the Bankruptcy Court's findings of fact will not be set aside unless clearly erroneous. *In re Chase & Sanborn Corp.*, 904 F.2d 588 (11th Cir.1990); *In re T & B General Contracting, Inc.*, 833 F.2d 1455 (11th Cir.1987). A finding of fact is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Conclusions of law are subject to de novo review. *In re Chase & Sanborn Corp.*, 904 F.2d at 593; *In re Sublett*, 895 F.2d 1381 (11th Cir.1990). *De novo* review requires the court to make a judgment "independent of the bankruptcy court's, without deference to that court's analysis and conclusions." *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1210 (7th Cir.1984).

■ Although the bankruptcy court's factual findings are subject to a clearly erroneous standard, that standard does not apply to a determination of what law applies or the legal significance afforded the facts by the Bankruptcy Court. *Matter of Multiponics, Inc.*, 622 F.2d 709 (5th Cir.1980); *In re Evans Products Co.*, 60 B.R. 863 (S.D.Fla.1986).

## III. APPLICABLE LAW

Generally, pre-confirmation debts are discharged in Chapter 7 proceedings. 11 U.S.C. section 727(b). An express exception exists for federal income tax debts if the debtor has "made a fraudulent return or wilfully attempted in any manner to evade or defeat such tax." 11 U.S.C. section 523(a)(1)(C).[8] Because the terms "willfully" and "in any manner" are not defined by the Bankruptcy Code, section 523(a)(1)(C) has been subject to differing interpretations. One of the most critical questions faced by courts is whether the statute also covers conduct that avoids the payment of taxes known by the debtor to be owed. Most circuit courts that have considered the issue have found that the phrase "in any manner" is expansive enough to include evading or defeating the collection or payment of taxes. *E.g., In re Fegeley*, 118 F.3d 979 (3rd Cir. 1997); *In re Zuhone*, 88 F.3d 469, 473 (7th Cir.1996); *In re Toti*, 24 F.3d 806 (6th Cir. 1994); *In re Bruner*, 55 F.3d 195 (5th Cir. 1995).

7. The values Sternberg's accountant, Friedman, assigned to the intangible properties transferred pursuant to the Amendment, and the earnings reported on Sternberg's tax returns are set forth below.

| | Friedman's Valuation | Income 1988 | Income 1989 | Income 1990 | Income 1991 | Income 1992 | Income 1993 |
|---|---|---|---|---|---|---|---|
| Prof. Assoc. | $15,000 | unknown | 92,471 | 491,287 | 723,085 | 754,177 | 178,542 |
| MRI, Boca Raton | 0 | 26,084 | 60,846 | 30,709 | 30,942 | 4,950 | 1,678 |
| SASGP, Inc. | 12,926 | 37,840 | 41,782 | 39,134 | 30,628 | 19,747 | 8,950 |
| Askay, Inc. | (10,845) | 17,221 | 23,032 | 19,721 | 14,573 | 6,470 | 7,296 |
| PODC, Inc. | 15,709 | 21,011 | 17,844 | 13,785 | 3,056 | 1,166 | unknown |
| Reading Contracts (MD Corp.) | 50,000 | unknown | unknown | 264,429 | 60,799 | 195,426 | unknown |

8. 11 U.S.C. section 523(a)(1)(C) provides as follows: Exceptions to Discharge:
    (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
    (1) for a tax or customs duty—

. . . . .

    (c) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax.

**Interpretation of Section 523(a)(1)(C).**
The appellee argues that section 523(a)(1)(C) applies only to a debtor who willfully attempts to evade or defeat a tax, not to a debtor who merely attempts to evade or defeat *payment* of such tax. Appellee relies on an Eleventh Circuit case which held that the failure to pay taxes, without more, does not except a debtor from discharge. *In re Haas,* 48 F.3d 1153 (11th Cir.1995). In *Haas,* the Eleventh Circuit found that there had been no willful attempt to evade taxes where the debtor had filed an accurate return, but had paid his living expenses instead of his taxes. The court noted that Haas "did not conceal assets, engage in dubious transfers of assets, falsify or destroy books or records, or misstate the amount of income in the respective years at issue." *Id.* at 1155. The United States argues that *Haas* is readily distinguishable from this case because here the evidence shows that the debtor took certain affirmative steps to evade payment of his taxes. *Haas* does not reach situations where it is alleged that the debtor did not merely fail to pay his taxes, but attempted to defeat them by understating his tax liability on his returns and by attempting to place his assets beyond the reach of the IRS.

█ Thus the threshold legal question that had to be addressed by the Bankruptcy Court in this case is whether an interpretation of section 523(a)(1)(C) to include a debtor's transfer of property to a family member to thwart the government's collection or payment of taxes owed is inconsistent with the Eleventh Circuit's holding in *Haas.* Addressing that question, the Bankruptcy Court found that section 523(a)(1)(C) includes an attempt to evade the payment of taxes and that such a finding is not inconsistent with the holding in *Haas.* Noting that the Eleventh Circuit had considered the activities of Haas before reaching its conclusion, the Bankruptcy Court in this case wrote, "[i]n most cases, it seems that the main consideration is whether the actions of the debtor are the actions of an honest but unfortunate individual." This Court agrees with the Bankruptcy Court's interpretation of section 523(a)(1)(C). This interpretation is also in accordance with the decisions of other district court judges in Florida. *See e.g. In re*

*Griffith,* 210 B.R. 216 (S.D.Fla.1997)(distinguishing circumstances in which debtor has taken affirmative action and has transferred assets to wife from the mere failure to pay that was presented to the 11th Circuit in *Haas,* and finding tax debt nondischargeable where debtor's transfer of assets to wife pursuant to antenuptial agreement lacked adequate consideration); *In re Tai,* 1996 WL 529411 (Bankr.M.D.Fla.1996)(federal tax obligations of debtor, of which debtor was fully aware, were not dischargeable where debtor transferred real property to family limited partnership but received no consideration).

Courts in other jurisdictions have also interpreted section 523(a)(1)(C) to mean that the tax liabilities of debtors are excepted from discharge where the debtor, knowing about his tax liabilities, has transferred assets to family members or family trusts to evade or defeat the payment of such tax. *See e.g., Matter of Zuhone,* 88 F.3d 469 (7th Cir.1996)(tax liabilities excepted from discharge where debtor created a corporation, transferred the stock to his daughters and named them shareholders, officers, and directors while retaining control of management and daughters participated minimally, if at all, in management of corporation); *In re Dalton v. I.R.S.,* 77 F.3d 1297 (10th Cir.1996)(debtor's transfer of ownership of condominium and stock in corporation to wife were attempts to evade or defeat taxes where debtor had paid most of the purchase price for condominium before the marriage and possessed the expertise to run the business); *In re Sumpter,* 64 F.3d 663 (6th Cir.1995)(timing and sequence of events led court to conclude that transfer of property owned by debtors to trust previously set up for the debtor's children constituted willful attempt to evade or defeat debtor's income tax); *Matter of Birkenstock,* 87 F.3d 947 (7th Cir.1996)(income tax liabilities not discharged where debtor conveyed family assets to a trust and received no consideration in return); *In re Schaeffer,* 201 B.R. 282 (Bankr. D.Colo.1996)(where debtor who was aware of his tax liabilities transferred all his interest in his home and vehicle to wife without consideration, court concluded that debtor willfully attempted to evade or defeat taxes).

This interpretation of section 532(a)(1)(C) is consistent with the purpose of the statute; that is, to prevent the use of the Bankruptcy Code as a means to avoid tax liability. 4 Lawrence P. King et al., Collier on Bankruptcy P 523.07[4] (15th ed.1996). Because simple nonpayment of a tax does not justify a finding of nondischargeability, the taxing authority must prove willful evasion. The issue of willful evasion is a question of fact that is to be determined by the bankruptcy court from the totality of the record. *In re Williams*, 186 B.R. 521, 522 (M.D.Fla. 1995). The court must examine the intent of the debtor and whether he acted in knowing violation of a legal duty. *In re Zimmerman*, 204 B.R. 84, 87–88 (Bankr.M.D.Fla.1996). The type of willfulness required under section 523(a)(1)(C) is more than inadvertence, carelessness, or honest misunderstanding. *Id.* at 88. It is generally held that the test to determine whether the debtor has "willfully attempted in any manner to evade or defeat" is whether (1) there was a duty under the law to pay the tax; (2) the debtor knew he had the duty; and (3) he voluntarily and intentionally violated the duty. *In re Bruner*, 55 F.3d 195, 197 (5th Cir.1995). The United States bears the burden of proving nondischargeability by a preponderance of the evidence. *In re Greene*, 207 B.R. 21 (Bankr. M.D.Fla.1997); *In re Wright*, 191 B.R. 291, 292 (S.D.N.Y.1995), *citing Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Thus to except a tax debt from discharge, as one arising from the debtor's willful attempt to evade or defeat taxes, the United States must demonstrate that the debtor voluntarily, consciously, or intentionally attempted to evade tax. *In re Greene*, 207 B.R. at 24; *In re Bertelt*, 213 B.R. 173 (Bankr.M.D.Fla.1997).

**Circumstantial Evidence of Fraud.** Direct proof of fraudulent intent is rarely available. For this reason, courts have traditionally relied on certain well-defined badges or indicia of fraud to presume fraudulent intent to transfer.[9] *In re Landen*, 1997 WL 416437 (Bankr.M.D.Fla.); *Greene*, 207 B.R. at 24; *In re Zimmerman*, 204 B.R. 84 (Bankr.M.D.Fla.1996); *In re Warner*, 87 B.R. 199 (Bankr.M.D.Fla.1988). A willful intent to defeat or evade taxes may be inferred from any conduct likely to mislead or conceal. *In re Griffith*, 210 B.R. 216, 220 (S.D.Fla.1997); *See also Biggs v. Commissioner*, 440 F.2d 1, 5 (6th Cir.1971)("Fraud need not be established by direct evidence, but can be shown by surveying the taxpayer's entire course of conduct and drawing reasonable inferences therefrom"). In the context of determinations of fraudulent transfers under section 523(a)(1)(C), courts within the Eleventh Circuit have identified certain types of conduct as "badges of fraud" which serve as circumstantial evidence of willful intent to evade taxes. These badges of fraud include the following circumstances:

1) The recurrence of the understatement of income for more than one tax year;

2) The understatement of income;

3) Implausible or inconsistent explanations of behavior;

4) Inadequate records;

5) Transfer of assets to a family member;

6) Transfer for inadequate consideration;

7) Transfer that greatly reduced assets subject to IRS execution;

8) Transfers made in the face of serious financial difficulties.

*Landen*, 1997 WL 416437; *Huber*, 213 B.R. at 184–85; *Greene*, 207 B.R. at 25; *Zimmerman*, 204 B.R. at 88; *Warner*, 87 B.R. at 202. No one factor is determinative; the court must base its decision on the totality of the circumstances. *Greene*, 207 B.R. at 25. While a single badge of fraud may amount to only a suspicious circumstance, a combination of them will justify a finding of fraud. *United States v. Fernon*, 640 F.2d 609 (5th Cir. 1981); *In re Tai*, 1996 WL 529411 (Bankr.

---

9. *See generally, BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), "The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated "covinous and fraudulent" transfers designed "to delay, hinder or defraud creditors and others." 13 Eliz., ch. 5 (1570). English courts soon developed the doctrine of "badges of fraud": proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent."

M.D.Fla.). The presence of several badges of fraud gives rise to a rebuttable inference of fraud. *Advest, Inc. v. Rader,* 743 F.Supp. 851, 854 (S.D.Fla.1990); *In re Tai,* 1996 WL 529411; *In re Warner,* 87 B.R. at 202. And where the parties involved in the alleged fraudulent transfer have a close relationship, the close relationship tends to establish a prima facie case and the transaction is regarded with suspicion. *Id. citing United States v. Ressler,* 433 F.Supp. 459, 464 (S.D.Fla.1977); *See also Harper v. United States,* 769 F.Supp. 362 (M.D.Fla.1991).

■ Although these are the factors traditionally applied by courts to determine fraudulent intent in conveyance cases, including those under section 523(a)(1)(C), the Bankruptcy Court in this case failed to take them into consideration. This Court has examined the record and has found that several badges of fraud were present in this case, giving rise to a rebuttable inference of fraud. *See Advest, Inc. v. Rader,* 743 F.Supp. 851, 854 (S.D.Fla.1990); *In re Tai,* 1996 WL 529411; *In re Warner,* 87 B.R. at 202.

The first indicator of fraud was that Sternberg's behavior was implausible or inconsistent. In January of 1989 when he married May, he had his lawyer draft a prenuptial contract under which the parties agreed to keep their assets separate. Ten months later, immediately after the Tax Court came out with an unfavorable ruling and it looked as if a negative outcome of his tax case was inevitable, Sternberg's lawyer drafted an amendment which directly contradicted the terms of the original agreement. The suspicious nature of this sudden change of heart was noted by the Bankruptcy Judge who wrote that "[c]learly, the timing of the transfers from the debtor to May is suspect." In his Memorandum Opinion, the Judge also observed that the debtor and his wife amended the prenuptial agreement on "November 30, 1989 (and perhaps not so coincidentally after the Tax Court Order was entered)." Even the stated purpose of the Amendment was discredited by the Bankruptcy Court. The Amendment provided that the parties entered into the Amendment to account for the "considerable disparity in age of the parties hereto, the potential professional liabili-

ties inherent in Mr. Sternberg's practice of medicine, and the speculative nature of Mr. Sternberg's business ventures." The Bankruptcy Court, however, rejected this explanation finding that these circumstances "existed at the time of the execution of the Agreement, and did not arise within the 10 months between the Agreement and the Amendment." Consequently, the Bankruptcy Court concluded that "the Debtor amended the Agreement either as consideration for May quitting her job or as an attempt to evade his tax liability."

Inconsistent conduct was also shown by Sternberg's valuation of his assets. In the prenuptial agreement, Sternberg reported his net worth at almost six million dollars. His assets included a fifty percent ownership in a professional association, valued at $500,000, and various partnership and shareholder interests in MRIs, and exclusive contracts to read results at the MRI centers. These valuations were affirmed at the time of the transfer, in the Amendment. Yet at trial, Sternberg claimed that the assets were worth considerably less.

A second badge of fraud is presented by Sternberg's transfer of almost all his attachable assets to a family member. As stated previously, transfers to family members tend to create a prima facie case of fraudulent transfer. *United States v. Ressler,* 433 F.Supp. 459, 464 (S.D.Fla.1977); *In re Tai,* 1996 WL 529411. A third badge of fraud is present in this case because the evidence shows that the transfers were not based on adequate consideration. May earned $56,000 a year as a writer for the *National Enquirer.* At the time of the transfers made pursuant to the Amendment, Sternberg valued his assets at over $5 million. Assuming that the transfers were made in exchange for May's termination of employment, giving up a job paying $56,000 a year is hardly sufficient consideration for the transfer of assets totally in the millions of dollars. Furthermore, there is no evidence to support a finding that May ever quit her job. The Amendment, which was drafted by Sternberg's skilled lawyer, did not even mention May's obligation to quit working.

A fourth badge of fraud is present here in that Sternberg's transfers to May alone, or to May and Sternberg as tenants by the entirety, greatly reduced the number of assets subject to IRS execution. After the transfers made pursuant to the Amendment and the assignments, Sternberg was left without assets to pay his tax liability, leading him to file for bankruptcy. A fifth badge of fraud,—transfers made in the face of serious financial difficulties—is also found here because Sternberg knew he was facing a large tax debt at the time of the transfers. An additional indicator of fraudulent intent is present in this case. In considering whether property was transferred with the willful intent to evade taxes, courts often consider whether the property that was transferred to another party continues to be managed or controlled by the transferor. Continued control and management suggests the transfer was not "legitimate." *See e.g., In re Zuhone,* 88 F.3d 469 (7th Cir.1996); *In re Tai,* 1996 WL 529411. In this case the evidence at trial showed that May did not manage the assets transferred to her. They continued to be managed by Sternberg.

In demonstrating the presence of these badges of fraud, the United States raised a rebuttable inference that the transfers were made as a willful attempt to evade the payment of taxes. *See Fernon,* 640 F.2d at 613; *Warner,* 87 B.R. at 202. This inference of fraud remained essentially unrebutted by Sternberg. Although Sternberg claimed that he transferred the property to May in consideration for her quitting her job, this claim is unconvincing in light of the fact that the Amendment to the prenuptial agreement did not obligate May to quit her job nor was any evidence presented showing that she did quit. Because the debtor failed to rebut the inference of fraud established by the United States, the United States' showing that Sternberg transferred almost all his attachable assets in a willful attempt to evade of defeat payment of taxes was sufficient enough to call into play the exception from discharge created by section 523(a)(1)(C) of the Bankruptcy Code.

■ **Adequacy of consideration.** The Bankruptcy Court found that the assets transferred to May pursuant to the Amendment had an almost negligible value. Based on this finding that the property transferred had a negligible value, the Bankruptcy Court found that May gave adequate consideration for the transfers. The United States argues that the Bankruptcy Court erred in reaching this conclusion. First, the United States points out that in determining whether Sternberg received consideration for the asset transfers, the Bankruptcy Court considered only those transfers made pursuant to the Amendment to the prenuptial agreement. All the transfers by assignment made to May after the Amendment, including the assignment of income to Berghini Consulting, were ignored by the Bankruptcy Court. A reading of the Bankruptcy Court's final judgment indicates that the United States' allegation is well founded; the Bankruptcy Court did focus solely on the transfers made pursuant to the Amendment. This was error. The transfers by assignment were made at a time when the debtor knew about his federal tax liability and these transfers by assignment could have been made in an attempt to evade payment of taxes. After these transfers were made, Sternberg's assets were beyond the reach of the IRS. All of Sternberg's asset transfers should have been considered for section 523(a)(1)(C) purposes. *See In re Zuhone,* 88 F.3d 469 (7th Cir.1996)(holding that intentional reduction of taxpayer's salary to avoid garnishment is indicative of intent to evade or defeat tax); *In re Wright,* 191 B.R. 291 (S.D.N.Y.1995)(holding that rerouting revenue generated by medical practice to new corporation to avoid levy was an affirmative act to evade taxes under *Haas* ). The Bankruptcy Court's failure to consider these transfers by assignment was error.

■ Second, the United States contends that the Bankruptcy Court erred in accepting the valuations of the debtor's business assets suggested by Milton Friedman, without consideration of the assets' earning potential. The debtor disclosed his assets as worth over five million dollars at the time he entered into the prenuptial agreement, and he reaffirmed those values in the body of the Amendment. Yet at trial, the debtor and his accountant argued that these assets were

almost worthless. In reaching this position, the debtor's accountant valued the assets by simply looking at the net book value of the commercial assets while completely ignoring its potential revenues. This method valuation, argues the United States, is improper.

The best test of the value of a going commercial enterprise is its earning capacity. *Dudley v. Mealey,* 147 F.2d 268, 270 (2d Cir.1945). The value of property results from the use to which it is put, present and prospective, actual and anticipated. *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Backus,* 154 U.S. 439, 445, 14 S.Ct. 1122, 38 L.Ed. 1041 (1894). Justice Holmes stated many years ago that "the commercial value of property consists in the expectation of income from it." *Galveston, Harrisburg & San Antonio Ry. Co. v. Texas,* 210 U.S. 217, 226, 28 S.Ct. 638, 52 L.Ed. 1031 (1908). *See also, Consolidated Rock Products Co. v. DuBois,* 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941). When an enterprise is to be valued "as a going concern," the valuer must consider whether it has a going concern value, and that value is something other than the results from the mere appraisal of its assets. *Campbell v. American Fabrics Co.,* 168 F.2d 959, 962 (2d Cir.1948). For this reason, the book value of an enterprise operating as a going concern has been properly rejected by courts as a measure of value for many years. *Lewis v. Clark,* 911 F.2d 1558, 1563 (11th Cir.1990). Testimony of book values produces no competent evidence of "fair valuation." *Dreyer v. Greene,* 267 F.2d 44 (5th Cir.1959). The Court of Appeals for the Seventh Circuit in *Beerly v. Department of Treasury,* 768 F.2d 942 (7th Cir.1985), explained the problems with relying on book value.

> The main component of book value is the original cost of the firm's assets, as depreciated. Wholly apart from the vagaries of depreciation, if a firm's assets are specialized to the firm's business they may have very little sale value. Their only value may be to generate the firm's earnings. But then it is clear that the value of the firm is some multiple of its earnings, and

not some function of the original cost of its assets.

*Id.* at 946.

The Bankruptcy Court, in adopting the valuation of the debtor's assets made by his accountant, did not consider anticipated earnings, the value of the assets when they were eventually sold, or the wages paid by the entities to their principals. That Dr. Sternberg's business assets were, in fact, quite valuable, was shown by the huge amounts of profits generated by these investments over the next few years. The Schedules E on each of the Sternbergs' joint federal income tax returns for 1990, 1991, and 1992, report the Sternbergs' income from the radiology and MRI businesses of an average of over one million dollars each year.

## CONCLUSION

One of the primary purposes of the Bankruptcy Code is to provide a fresh start for the "honest but unfortunate debtor." Disallowing a discharge of tax debts owed by debtors who have endeavored to evade taxes will not undermine the Bankruptcy Code's fresh start objective; it will promote an equally important Congressional objective that the Bankruptcy Code does not become a tax evasion device. *See United States v. O'Day,* 1996 WL 814496 (M.D.Fla.). The evidence at trial does not support a finding that Dr. Sternberg was an "unfortunate" debtor. Transferring assets and income to avoid paying tax liabilities is not honest. At trial the United States established a rebuttable inference that the asset transfers were made to evade payment of taxes. That inference of fraud was not rebutted by the debtor. Sternberg's claim that he amended the prenuptial agreement as consideration for May's quitting her job is not credible first because it contradicted the purpose for the transfers as expressed in the Amendment, and second because there is no evidence showing that May did quit her job. Moreover, as the Bankruptcy Court noted, the timing of the agreement to transfer assets is highly suspect, coming just after the Tax Court's adverse ruling. Finally, the Bankruptcy Court's finding that the assets transferred to May were almost worthless should be set

**250**

aside because the Court erroneously failed to consider the asset and income transfers made by assignment and considered only the book value of the assets. Accordingly, the Bankruptcy Court's determination that Sternberg's tax liabilities were dischargeable is reversed.