**Dona H. SLY, Appellant, Plaintiff,**

v.

**UNITED STATES of America, Treasury Department, Internal Revenue Service Division, Appellee, Defendant.**

**Civ No. 3:04CV00036/RV.
Bankruptcy No. 90–04377.**

United States District Court,
N.D. Florida,
Pensacola Division.

Oct. 5, 2004.

---

James L. Chase, Chase, Quinnell, Mciver, Etc., Pensacola, FL, for Plaintiff.

Benjamin W. Beard, U.S. Attorney—Pensacola FL Northern District of Florida, Pensacola, FL, Rebeccah L. Bower, U.S. Department of Justice, Wendy K. Vann, U.S. Department of Justice—Tax Division, Washington, DC, United States Trustee, Tallahassee, FL, for Defendant.

## MEMORANDUM OPINION

VINSON, District Judge.

This matter comes before this Court on appeal from the Bankruptcy Unit of this

Court. On December 4, 2004, the bankruptcy court determined that the 1980, 1981, and 1982 tax obligations of Chapter 7 debtor, Dona H. Sly, were excepted from discharge under Title 11, United States Code, Section 523(a)(1)(C). Sly appeals the bankruptcy court's decision to this court pursuant to Title 28, United States Code, Section 158(a).

## I. BACKGROUND

Dona and Joann Sly founded the Universal Church of Jesus Christ ("Universal") in Alabama in 1975. At its inception, the church had only four members: Dona and Joann Sly and William and Juanita Reed. The members elected Dona Sly ("Sly") as the pastor, and they agreed that Universal would pay almost all of Sly's personal expenses, including his mortgage, utilities, and transportation.

Universal applied with the Internal Revenue Service ("IRS") to have tax exempt status, and the IRS granted such status on May 1, 1975. On its IRS application for tax exempt status, which Sly filled out and prepared, Universal stated that its purpose was to operate a church and conduct services. Consistent with its tax-exempt status, Universal did conduct some activities normally associated with churches. For instance, Universal conducted bible studies, held weddings and funerals, and at various times helped members of the community who were in need. However, Sly also operated at least four commercial businesses under Universal's tax exempt status. These businesses were considered "departments" of Universal. Sly did not report any of the income received from Universal on his personal income tax forms.

The most lucrative and successful of Universal's commercial businesses was a debt collection agency called the Bureau of Collection Department ("Collection"). Sly originally incorporated Collection with one other partner, Benny Moore, in Tennessee around 1967 or 1968. In 1974, the Tennessee Collection Service Board revoked Collection's license to operate a debt collection business. Subsequent to the revocation, Sly and Moore sold Collection to Universal for $1.00. Although Collection's license had been revoked, Universal continued to operate Collection through a department of the church as a debt collection agency in much the same manner as before. Sly testified that after the transfer Collection operated more as a mediation service promoting voluntary payments by debtors and acceptance of lesser payments by creditors. However, Collection still sent to the debtors a series of three computer generated letters which contained a letterhead, registered with the United States Patent Office, displaying an old man wearing a judicial robe with an uplifted gavel. The letterhead gave the appearance that the letters were sent from a judicial or governmental entity. The first letter would state that it was from a credit manager, the second from the regional manager, and the third from a national director. Collection also continued to collect fees for its service in much the same manner as before the transfer to Universal.

The Federal Trade Commission eventually investigated Collection's activities, in 1979, and filed suit against Universal and Collection in the United States District Court for the Northern District of Alabama. The District Court ruled that Universal and Collection were engaging in activities in violation of the Fair Debt Collection Practices Act. Accordingly, the court issued a permanent injunction against Collection, but Universal ignored the injunction and continued to operate Collection.

Universal also operated three other commercial businesses through depart-

ments of the church. These businesses included a magazine subscription service called Home Ambassadors ("Ambassadors"), a company which distributed information about local businesses called the Better Business Bureau of Calhoun and Etowah Counties ("Better Business"), and an insurance business called the Christian Health Care Plan ("Christian Health"). Ambassadors, established in 1975, sold magazine subscriptions, including nonreligious magazines, door to door.[1] Ambassadors' salesmen would leave an order form at the residence for the contributor to mail in themselves, but would usually ask the resident to contribute 30 to 50 percent of the subscription price of the magazine to Universal. After receiving numerous complaints that contributors never received the magazines, Ambassadors ceased operations in 1978.

Better Business's commercial purpose was to share information and handle complaints regarding local businesses. Local businesses would become members and contribute monthly payments. Also, Better Business sought to collect dues, fees, and donations to support itself. Eventually, the Council for Better Business Bureaus and Better Business Bureau, Inc., sued Better Business for trademark infringement. Sly and the company entered into a consent judgment prohibiting Better Business from using such trademarks. Nonetheless, Sly and Better Business were later found in contempt for failing to comply with the consent order.

Christian Health did not operate for very long. It was intended to be a health insurance plan in which the members shared the medical costs of the other members by contributing on a monthly basis. However, in 1982, one year after it began operations, the Illinois Director of Insurance issued a cease and desist order re-

quiring Christian Health and Universal to discontinue operations because they were not authorized to sell insurance.

During the years that these four businesses were in operation, the IRS periodically sent questionnaires to Universal to determine whether· Universal's activities continued to meet the requirements for tax exempt status. Sly failed to complete a 1977 questionnaire from the IRS adequately. After the IRS sent a more detailed questionnaire in 1978, Sly claimed that the IRS was violating Universal's constitutional rights, and Sly questioned the IRS's authority for asking the questions set forth in the questionnaire. As a result of Sly's failure to answer the questionnaire adequately, in 1979 the IRS sent an agent to personally examine Universal's records. However, Sly refused to permit the agent to inspect Universal's records on that day. The IRS subsequently served Sly and Universal with a summons to appear and produce Universal's records at which time Sly did convey the records to the IRS. After a lengthy examination period, the IRS revoked Universal's tax exempt status on December 16, 1981. The revocation was retroactive to May 1, 1975.

Sly and Universal filed a declaratory action against the IRS in the United States Tax Court seeking to re-establish Universal as a tax-exempt entity. *Universal Church of Jesus Christ, Inc. v. Commissioner*, 55 T.C.M. (CCH) 144, 1988 WL 12612 (1988). The Tax Court found that "not only were the nonexempt purposes for which the Church was operated substantial, but they were the primary reasons for the Church's existence." *Id.* Furthermore, the Tax Court determined that Sly had "failed to come forward with evidence sufficient to show that sums paid to or on behalf of Sly and his family consti-

---

1. Sly testified that Ambassadors' purpose was to get good reading material into the homes.

tuted a reasonable salary rather than inurement to their benefit as private individuals." *Id.* Finally, the Tax Court found that Sly's explanation that Universal's activities were primarily of a religious nature was unconvincing. *Id.* Accordingly, the court upheld the IRS's revocation of Universal's tax exempt status as of May 1, 1975. *Id.*

The IRS reconstructed Sly's income for the years 1980 through 1983 including unexplained deposits to his individual checking account and payments that Universal made on Mr. and Mrs. Sly's behalf. The IRS also assessed an additional amount due for fraud, pursuant to section 6653(b) of the Internal Revenue Code. The Slys filed an action in the United States Tax Court challenging the IRS's reconstruction and assessment of their tax obligation. *Sly v. Commissioner,* 56 T.C.M. (CCH) 209, 1988 WL 94450 (1988). The Slys submitted voluminous records in evidence to the Tax Court regarding the businesses Universal operated. The Tax Court determined that the amount of records was overwhelming and ordered the Slys to work with the IRS to organize the record to facilitate the disposition of the case. When the Slys failed to cooperate with the IRS order, the court entered a default order against them as a sanction. *Id.* The court held in the default order that not only had the IRS met its burden concerning the level of tax liability, but also that the IRS's allegations regarding tax fraud were deemed to be admitted by the Slys. *Id.*

In 1990, Mr. and Mrs. Sly filed a petition under Chapter 11 of the Bankruptcy Code. The case was later converted to a Chapter 7 petition and the Slys received their discharge in bankruptcy on March 3, 1993. However, the IRS subsequently informed the Slys of its position that their 1980 through 1983 tax liabilities were not affect-

ed by the discharge. Sly responded that he believed that his 1980–1983 tax obligations were discharged, but he also continued to correspond with the IRS and attempted to negotiate a resolution. Sly and the IRS did not reach a resolution. As a result, on June 7, 2001, Mr. and Mrs. Sly filed an adversary proceeding requesting that the bankruptcy court determine the dischargeability of their 1980 through 1983 unpaid federal income tax liabilities. Both parties filed summary judgment motions arguing the preclusive effect of the prior tax court cases, but the bankruptcy court denied both motions. The IRS also filed a second summary judgment motion based on the post-petition assessment of the Slys' 1983 taxes. The bankruptcy court granted the IRS's summary judgment motion regarding the Slys' 1983 tax obligations [*In re Sly,* Case No. 90–04377, Adv. No. 01–8025 (Bankr.N.D.Fla.2003)] and then held a trial regarding the dischargeability of the Slys' taxes for the remaining years, 1980–1982. Following the trial, the court determined that Sly's tax liabilities for the three years were excepted from discharge because he had filed fraudulent returns and attempted to evade or defeat taxes from 1980 through 1982. However, Joann Sly's tax obligations were deemed discharged and are not at issue in this appeal.

## II. STANDARD OF REVIEW

A district court must accept a bankruptcy judge's findings of fact unless they are clearly erroneous. *In re Bush,* 62 F.3d 1319, 1322 (11th Cir.1995). The court reviews the bankruptcy judge's conclusions of law *de novo. Id.* When determining whether the bankruptcy court's factual findings are clearly erroneous, a reviewing court must ask whether "on the entire evidence" it is "left with the definite and firm conviction that a mistake has been committed." *United States v. United*

*States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

## III. ANALYSIS

Title 11, United States Code, Section 523(a)(1)(C) excepts from discharge any tax debt in which the debtor: (1) made a fraudulent tax return, or (2) willfully attempted in any manner to evade or defeat such tax. Thus, section 523(a)(1)(C) contains two prongs describing alternative circumstances under which a tax debt may be excepted from discharge. The bankruptcy court determined that Sly's conduct with respect to his tax obligation in 1980–1982 satisfied both prongs. Accordingly, the bankruptcy court found that Sly's 1980, 1981, and 1982 tax obligations were excepted from discharge.

On appeal, Sly does not dispute the bankruptcy court's conclusion of law that his tax debt would be excepted from discharge if either of the two prongs are satisfied. Instead, Sly appeals the factual determinations made by the bankruptcy court when it applied the alternative prongs of Section 523(a)(1)(C) to the facts of this case.

### A. Whether Sly Filed a Fraudulent Tax Return

■ The bankruptcy court determined that Sly fraudulently filed his personal tax returns in 1980, 1981, and 1982. The court relied on six established "badges of fraud" as indicators of fraudulent activity. *See Berkery v. Commissioner*, 192 B.R. 835, 841 (E.D.Pa.1996). The types of conduct that typically constitute "badges of fraud" include: (1) large understatements of income made consistently over time; (2) failure to keep adequate records; (3) failure to file tax returns; (4) implausible or

inconsistent behavior by the taxpayer; (5) concealing assets; and (6) failure to cooperate with taxing authorities. *Berkery, supra*, 192 B.R. at 841. Ultimately, the badges of fraud are to be considered in their entirety and the determination of whether the debtor fraudulently filed taxes should be based on the totality of the circumstances. *United States v. Sternberg*, 229 B.R. 238, 246 (S.D.Fla.1998)(citing *In re Greene*, 207 B.R. 21, 25 (Bankr. M.D.Fla.1997)). Thus, the existence of a particular badge of fraud is not determinative. In this case, the bankruptcy court determined based on the evidence that four of the six badges of fraud existed.[2] On appeal, Sly contends that the bankruptcy court made inconsistent findings regarding each of these four badges of fraud.

### 1. Large Understatements of Income

■ First, the bankruptcy court found that Sly made large understatements of income consistently over time. Sly appeals this finding, arguing that income from Collection was used to purchase a building with pews, piano and pulpit; to provide housing to three teen-aged girls from a detention center; and to provide care for several elderly gentlemen. Thus, Sly contends that the court incorrectly found that income generated by Collection was personal income to Sly, rather than income used to further church purposes.

The bankruptcy court's determination that Sly understated his income on his personal tax returns for the years at issue is consistent with the evidence. Sly testified that Universal paid almost all of his personal expenses. Tr.45–50. Such expenses included his mortgage, food, transportation, utilities, medical bills, veterinary

---

**2.** The Court found that two badges of fraud, failure to keep adequate records and failure to file income tax returns, did not exist.

bills, clothes and any other materials needed by Sly. *Id.* The majority of this income received from Universal was generated by Collection, a commercial enterprise which Sly had operated since 1968 before it was transferred to a department of Universal. Tr. 28–29. *See also,* Gov. Ex. T, Deposition of Dona Sly, p.63. Nevertheless, Sly, a relatively sophisticated businessman, did not report any of these payments as personal income on his 1980 through 1982 tax returns. Although Sly testified that he received such income from Universal because he was on call twenty-four hours a day to meet the needs of the community, he also testified that his employment with HELP, which was unrelated to Universal, caused him to travel and be away from home a great deal of the time. Tr. 49 and Tr. 92. Thus, the bankruptcy court's determination that Sly understated his income by large amounts is not clearly erroneous.

### 2. Inconsistent or Implausible Behavior

■ Next, Sly appeals the bankruptcy court's finding that he acted implausibly or inconsistently with respect to his tax obligation. The record amply supports the bankruptcy court's finding that Sly acted inconsistently and implausibly. Sly testified that he and Benny Moore became convinced that Collection was a non-Christian business, so they sold it to Universal. Tr. 21. Sly further testified that the business was sold with the understanding that it would be operated as a mediation service rather than a debt collection agency. Tr. 21–22. Despite Sly's testimony, however, the greater weight of the evidence plainly indicates that Collection was operated in a manner very similar to its pre-transfer

operations, including a continuation of the following activities: charging debtors a fee; using fictitious titles; using deceptive letterhead; bearing the legend "incorporated for the creditors protection"; and sending letters threatening legal action. *See Universal Church of Jesus Christ v. Commissioner,* 55 T.C.M. (CCH) 144 (1988). See also Tr. 22–27. Thus, the bankruptcy court's determination that Sly's behavior was inconsistent and implausible is not clearly erroneous.

### 3. Concealment of Assets

■ Next, Sly appeals the bankruptcy court's finding that he concealed assets. The record supports the bankruptcy court's finding that Sly concealed assets by transferring Collection, a commercial business, to Universal. Sly testified that he and Mr. Moore sold Collection to Universal for only one dollar. Tr. 21. In return for the dollar, Universal acquired all the debtors, all of the creditors, all the assets, and everything that Collection had that Mr. Moore and he had accumulated in the corporation during the previous seven or eight years. Tr. 22. Sly then proceeded to operate Collection in much the same manner as the business was operated before the transfer to Universal. Tr. 24.[3] Despite the lack of substantive change in operations after the transfer, Sly did not report income generated from Collection because it was operated as a department of Universal.

On appeal, Sly argues that he did not conceal assets because Collection had little if any value after the Tennessee Collection Service Board revoked its license to operate as a debt collection agency. The fact that Sly ignored the license revocation and continued to operate Collection in the

---

**3.** Although Sly testified that Collection was a "mediation service" after its transfer to Universal, he also admitted that the only change

in actual operation involved a change in the wording of letters sent to the debtor. Tr. 24.

same manner belies his claim that the company was in fact worth only one dollar. Sly testified that he believed that a debt collection license was not required, so he continued to operate the business. Tr. 22. Contrary to Sly's argument on appeal, the fact that Benny Moore was willing to part with Collection for only fifty cents does not undermine the conclusion that Collection was of considerable value to Sly. It perhaps indicates that Mr. Moore, unlike Sly, may have been unwilling to operate the business without a license, but that does not affect the bankruptcy court's findings and conclusions.

### 4. Failure to Cooperate with Taxing Authorities

■ The bankruptcy court also found that Sly's failure to cooperate with the IRS constituted another "badge of fraud." The bankruptcy court's finding is not clearly erroneous. The record establishes that Sly failed to cooperate in 1978 by not answering the IRS's questionnaires adequately when it made periodic inquiries into whether Universal continued to meet tax exempt status. The court reasoned that this factor was someone mitigated by Sly's post–1980 behavior in supplying the IRS with his files and attempting to resolve the matter. Thus, the court concluded that this badge, although existent, did not heavily weigh against Sly. The bankruptcy court's finding is not contrary to the evidence.

After determining that Sly's conduct constituted four out of the six relevant badges of fraud, the court concluded that Sly filed fraudulent tax returns in 1980, 1981, and 1982. Since the bankruptcy court's factual findings in arriving at this conclusion were amply supported by the evidence, the court's determination that Sly fraudulently filed tax returns is not clearly erroneous.

### B. Whether Sly Willfully Attempted to Evade or Defeat a Tax

■ Although the bankruptcy court found that Sly fraudulently filed his 1980, 1981, and 1982 tax returns, the court went on to examine the second prong of Section 523(a)(1)(C). This prong excepts from discharge any tax obligation with respect to which the debtor "willfully attempted to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). The statute includes both a conduct and a mental state requirement. *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1327 (11th Cir.2001).

### 1. Conduct Requirement

■ To satisfy the conduct requirement of Section 523(a)(1)(C), the creditor must prove that the debtor attempted to evade or defeat his tax liability "in any manner." 11 U.S.C. § 523(a)(1)(C). The conduct element is met when the creditor proves that the debtor engaged in either affirmative acts to avoid payment or collection of taxes, or the debtor engaged in acts of culpable omission designed to evade payment or collection of taxes, such as failing to file an accurate tax return. *In re Fretz, supra,* 244 F.3d at 1329. Thus, attempting to evade a tax obligation in any manner can be accomplished by either acts of commission or acts of culpable omission. *Id.*

The bankruptcy court found that Sly engaged in both acts of commission and culpable omission to evade his tax obligation. Sly appeals both of these judicial findings as contrary to the evidence. The record supports the conclusion that Sly engaged in an affirmative act to evade taxes by transferring Collection to Universal to avoid paying taxes on the profits. As noted, Sly sold a profitable business that he had operated since 1968 as a non-tax exempt commercial enterprise to Uni-

versal for only one dollar. In turn, Universal continued to operate the business in a similar manner, generating income for Sly.

Furthermore, the record also supports the conclusion that Sly committed a culpable omission by failing to amend Universal's tax exempt status after Universal began operating several commercial enterprises. On Universal's application for tax exemption, Sly indicated that Universal was to receive funds from tithes and offerings. See *Universal Church v. Commissioner*, 55 T.C.M. (CCH) 144 (1988). Nevertheless, the majority of Universal's income was supported by commercial business enterprises unrelated to the church. Furthermore, on Universal's application for tax exempt status, Sly stated that Universal's purpose was to operate a church and conduct services. *Id.* Notwithstanding, Universal operated at least four commercial businesses that were unrelated to the church's stated purpose. On appeal, Sly argues that income generated from Collection and the other businesses was appropriately tax exempt because the income was used to fund church and community activities, as well as to pay Sly's expenses as the full pastor of the church. Sly's argument is unavailing. Even if some of the funds generated by the commercial enterprises were in fact used to support church activities, Sly testified that almost all of his personal expenses were paid for by Universal, including veterinary and medical bills. TR.45–60. Also, Sly testified that some checks written out to Collection were deposited directly into his personal account instead of going to the church's bank account. Tr. 52. Thus, the record contains sufficient evidence to support the bankruptcy court's determination that Universal was actually Sly's alter ego, and a failure to amend Universal's tax exempt status represented a culpable omission.

### 2. Mental State Requirement

In addition to finding the necessary conduct existed, the creditor must demonstrate that the debtor acted wilfully. *Fretz, supra,* 244 F.3d at 1327. A debtor's conduct is considered willful if it is done "voluntarily, consciously or knowingly, and intentionally." *Id.* at 1330. In determining willfulness, the Eleventh Circuit has adopted a three-part test which the court may use: (1) whether the debtor had a duty to file income tax returns and pay taxes;(2) whether the debtor knew he had such a duty; and (3) whether the debtor voluntarily and intentionally violated that duty." *Id.* The third factor "prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate." *Id.*

Sly asserts several arguments in support of his contention that he did not intentionally, voluntarily and knowingly evade his tax obligation. Sly's first argument pertains to whether he had a duty to report income received from Universal. Despite the fact that Sly admitted at trial that he knew that he had a duty to file federal income tax returns and pay taxes, Tr. 75, Sly argues on appeal that there is no legal authority for the conclusion that he had a duty to pay taxes on income generated by Collection. Along this same line of reasoning, Sly suggests that willful intent was absent at the time he filed his tax returns because he did not have a crystal ball to foresee that Universal's tax exempt status would be revoked in the future.

In contrast to Sly's assertion, willful intent is not derived from the fact that Sly should have known that eventually Universal's tax exempt status would be revoked. Instead, the bankruptcy court determined

that Sly knew at the time he filed his tax returns that he had a duty to report income derived from commercial business enterprises operated through departments of Universal when those same enterprises were completely unrelated to the church's purpose. Thus, a determination of Sly's willful intent was made without reference to the eventual revocation of Universal's tax exempt status.

Furthermore, Sly argues on appeal that the IRS failed to prove he acted knowingly. Indeed, Sly testified at trial that he honestly believed he did not owe taxes on income received from Universal. Instead, he believed all income received from Universal was tax exempt, despite the fact that it was generated by several commercial enterprises. However, the record reflects that Sly's actions were both knowingly and willfully done, and the bankruptcy court was not persuaded by Sly's testimony. The bankruptcy court's determination of credibility should be given substantial deference by a district court. Fed. R. Bankr.P. 8013;[4] *In re Miller,* 39 F.3d 301, 305 (11th Cir.1994)("Because a determination of fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor, deference to the bankruptcy court's factual findings is particularly appropriate."). As a relatively knowledgeable and experienced businessman, the bankruptcy court determined that Sly knew that income generated by Collection did not fall under Universal's tax exempt umbrella simply by virtue of a transfer in ownership title, and the record supports this conclusion. Sly's true intent can be further evidenced by his refusal to cooperate with the IRS when it made inquiries into the continued appropriateness of Universal's tax exempt status.

■■ Sly also asserts that he relied on the advice of attorneys and accountants in failing to report the income he received from Universal on his personal tax returns. Reliance on a professional negates an intent to evade taxes and is a defense for an evasion charge. *In re Zimmerman,* 204 B.R. 84 (Bankr.M.D.Fla.1986). However, the record does not support Sly's assertion that he faithfully relied on counsel. Sly only testified that he sought the advice of experts when initially setting up Universal's tax exempt status with the IRS. Tr. 80–81. He also testified that an attorney represented him through all of his tax court cases and proceedings. Tr. 97. There is no evidence that an attorney or professional advised him that he could continue to use Universal's tax exempt status in operating a debt collection business. In fact, the record indicates that Sly was responsible for filing his own tax returns. Tr. 58–59. Accordingly, an advice of counsel defense is not supported by the evidence in the record.

■■ Finally, Sly argues that the evasion of taxes "involves conduct designed to place assets beyond the government's reach after a tax liability has been assessed." Initial Brief of Appellant, p. 19 (citing *United States v. Mal,* 942 F.2d 682 (9th Cir.1991)). In contrast to Sly's argument, the Eleventh Circuit has interpreted the language of the statute, "attempted in any manner," as sufficiently broad to include evasion of the assessment of a tax, as well as evasion of the payment of a tax. *In re Griffith,* 206 F.3d 1389, 1392 (11th Cir.2000). The fact that Sly and his wife did not live an extravagant lifestyle does

---

**4.** Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that on appeal "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."

not negate the finding that he willfully attempted to evade his tax obligation. Thus, the bankruptcy court's conclusion that Sly willfully evaded the assessment of personal taxes on income generated by several commercial enterprises is not clearly erroneous.

## IV. CONCLUSION

For the foregoing reasons, I conclude that the bankruptcy court did not clearly err in finding that Sly's 1980, 1981, and 1982 tax obligations are excepted from discharge under the Bankruptcy Code. Accordingly, the decision of the bankruptcy court is AFFIRMED.