**In re Dona H. SLY, Joann E. Sly, Debtors.**

**Dona H. Sly, Joann E. Sly, Plaintiffs,**

**v.**

**United States of America, (Treasury Department, Internal Revenue Service Division), Defendant.**

**Bankruptcy No. 90–04377.**
**Adversary No. 01–80025.**

United States Bankruptcy Court,
N.D. Florida,
Pensacola Division.

Dec. 4, 2003.

James L. Chase, Pensacola, Florida, Attorney for Dona and Joann Sly.

Wendy K. Vann, Washington, D.C., Attorney for United States of America.

## ORDER EXCEPTING FROM DISCHARGE DONA SLY'S 1980 THROUGH 1982 TAX DEBTS AND FINDING THAT JOANN SLY'S 1980 THROUGH 1982 TAX DEBTS ARE DISCHARGED

MARGARET A. MAHONEY,
Bankruptcy Judge.

This case is before the Court on the trial of an adversary proceeding brought by the debtors to determine the dischargeability of their tax debts to the Internal Revenue Service. This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court has the authority to enter a final order. For the reasons given below, the Court finds that the 1982 federal income tax debts of Dona Sly are excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C) and Joann Sly's are not.

### FACTS [1]

Dona and Joann Sly founded the Universal Church of Jesus Christ ("Universal") in Etowah County, Alabama in 1975. Universal originally had 4 members, Dona and Joann Sly and William and Juanita Reed. The members of Universal elected Mr. Sly to be its pastor. Although Mr. Sly was not paid a salary for his position, Universal paid all of his personal expenses and certain expenditures for his wife, Joann.

Universal applied for tax exempt status with the IRS on March 11, 1975. On its application, Universal stated that its purpose was to operate a church and conduct services. It was to receive funds from tithes and offerings. After Universal satisfied a few additional information requests by the IRS regarding its activities, Universal was granted tax exempt status as of May 1, 1975.

---

1. These facts are based on the testimony of the Slys at the November 3, 2003 trial, the evidence submitted by both parties, and three United States Tax Court decisions regarding the Slys' 1980 through 1983 federal income taxes. *See Universal Church of Jesus Christ, Inc. v. Commissioner,* 55 T.C.M. (CCH) 144, 1988 WL 12612 (1988); *Sly v. Commissioner,* 56 T.C.M. (CCH) 209, 1988 WL 94450 (1988); and *Sly v. Commissioner,* 57 T.C.M. (CCH) 1111, 1989 WL 83991 (1989).

The Court heard testimony about activities other than those specifically discussed in this opinion. The items not referred to were not necessary to the result and were therefore not discussed in the interest of brevity. For example, Universal operated a game room for children on its premises that generated a de minimis amount of income.

Consistent with its application for tax exempt status, Universal engaged in various activities that are normally associated with churches. It conducted services, held Bible studies, and held weddings and funerals. However, Universal also served as a conduit through which Mr. Sly operated at least four commercial businesses and Mrs. Sly operated one.[2] The four businesses included a debt collection agency called the Bureau of Collection Department ("Collection"), a magazine subscription service called Home Ambassadors ("Ambassadors"), a bureau to distribute information about local businesses called the Better Business Bureau of Calhoun and Etowah Counties ("Better Business"), and an insurance business called the Christian Health Care Plan ("Christian Health"). Each of these businesses was considered to be a department of Universal, with Collection being the most successful of the four. The Slys did not report any of the income they received from these businesses on their jointly filed tax returns.

Collection was originally a Tennessee corporation owned by Mr. Sly and one other partner. It was incorporated sometime in 1967 or 1968 under the name Bureau of Collections and subsequently sold to Universal for $1.00 after its license to operate as a collection agency was revoked by the Tennessee Collection Service Board in 1974. Even though Collection's license to operate had been revoked, Universal continued to operate the business in much the same way it had before it was sold to Universal.[3]

Collection's business consisted of mailing a series of 3 computer generated letters to debtors on behalf of the creditors it represented. The first letter would state that it was "from a credit manager, the second from a regional manager, and the third from a national director." *Universal Church of Jesus Christ, Inc. v. Commissioner,* 55 T.C.M. (CCH) 144, 1988 WL 12612 (1988). On each letter was a letterhead, registered with the United States Patent Office, that displayed an old man wearing a judicial robe with an uplifted gavel. This gave the appearance that the letters were from a court or government entity.

The Federal Trade Commission opened an investigation into Collection's activities in February 1979. It subsequently filed suit against Universal and Collection in the United States District Court for the Northern District of Alabama. Although the District Court issued a permanent injunction against Universal and Collection for engaging in activities in violation of the Fair Debt Collection Practices Act, Universal ignored the injunction because "it was against the belief and purpose of the Church" and continued to operate Collection. *Universal Church of Jesus Christ, Inc. v. Commissioner,* 55 T.C.M. (CCH) 144, 1988 WL 12612 (1988).

Ambassadors was established as a department of Universal in 1975. It sold magazine subscriptions of all kinds (not just those of a religious nature) door to door. Ambassadors would typically ask individuals to make a contribution to Universal of 30 to 50 percent of the subscription price of a magazine. It would leave

---

**2.** Mrs. Sly operated a beauty parlor for one year on Universal's premises but did not pay any rent for use of the facility. She testified that she filed a separate tax return for the year she operated the beauty parlor.

**3.** Mr. Sly testified that after the collection business was sold to Universal, it became more of a mediation service than a collection agency. In his view, Universal's operation promoted voluntary payments by debtors and acceptance of lesser payments or payments over time by creditors.

contributors an order form showing the amount of the contribution and the subscription price of the magazine purchased. The contributors were expected to send in the subscription price of the magazine on their own. After receiving numerous complaints regarding unfilled subscriptions, Ambassadors ceased all operations in 1978.

Better Business became a department of Universal in 1976. Its purpose was to share information and handle complaints regarding local businesses. Better Business relied on monthly contributions from businesses that became members and it sought to collect dues, fees, and donations to support itself. After being sued by the Council of Better Business Bureaus and Better Business Bureau, Inc. for trademark infringement, Mr. Sly and Better Business entered into a consent judgment prohibiting Better Business from using any trademarks of the Better Business Bureau. Nonetheless, Mr. Sly and Better Business were later found in contempt for failing to comply with the consent order.

Christian Health began operating as a department of Universal in 1981. It was a bare bones health insurance plan with all the members of the plan sharing in the medical costs of the others. Contributions were required of all members on a monthly basis. In 1982, the Illinois Direct of Insurance issued a cease and desist order requiring Universal to discontinue its operations because it did not have the authority to sell insurance.

During the time Universal operated these 4 businesses as departments of the church, the IRS periodically sent questionnaires to Universal to determine if its activities continued to meet the requirements necessary for it to have tax exempt status. The IRS found Mr. Sly's response to a December 28, 1977 questionnaire inadequate. The IRS sent a more detailed questionnaire to Mr. Sly on May 4, 1978.

In Mr. Sly's response to this questionnaire, he indicated that he believed Universal's constitutional rights were being violated by the IRS. He questioned the IRS' authority and reasons for asking the questions on the questionnaire. Based on Mr. Sly's response, the IRS determined that Universal had failed to adequately respond to its questionnaire. An IRS agent was dispatched to examine Universal's records on February 13, 1979. Mr. Sly refused to permit the agent to inspect Universal's records on that day and he was subsequently served with a summons to appear and produce Universal's records on March 5, 1979. Mr. Sly then conveyed Universal's records to the agent for examination. Based on the examination, Universal's tax exempt status was revoked on December 16, 1981. The revocation was given retroactive effect to May 1, 1975.

Mr. Sly and Universal filed a declaratory action against the IRS in the United States Tax Court seeking a determination that Universal was a tax exempt organization and that the IRS's revocation of its tax exempt status was null and void. *Universal Church of Jesus Christ, Inc. v. Commissioner*, 55 T.C.M. (CCH) 144, 1988 WL 12612 (1988). The Tax Court looked into Universal's activities to determine if those activities were primarily for exempt religious purposes or for nonexempt commercial purposes. It found that "not only were the nonexempt purposes for which the Church was operated substantial, but they were the primary reasons for the Church's existence." *Id.* Further, the Tax Court found that Universal "failed to come forward with evidence sufficient to show that sums paid to or on behalf of Sly and his family constituted a reasonable salary rather than inurement to their benefit as private individuals." *Id.* Finally, the Tax Court found that Mr. Sly's explanation that Universal's activities were primarily

of a religious nature was unconvincing. *Id.* Therefore, it upheld the IRS's revocation of Universal's tax exempt status as of May 1, 1975.

The IRS subsequently reconstructed the Slys' income for the years 1980 through 1983 based on the nonexempt status of Universal. To determine the amount of taxes due for those years, the IRS added to the Slys' income unexplained deposits to their individual checking account and payments that Universal made on the Slys' behalf. It then assessed an additional amount due for fraud. The Slys filed an action in the United States Tax Court challenging the amount of taxes the IRS claimed were due. *Sly v. Commissioner,* 56 T.C.M. (CCH) 209, 1988 WL 94450 (1988).

The Slys submitted their records for the businesses Universal operated into evidence to support their position. These records included bank account statements, receipts, and mileage information recorded by Mr. Sly. The Tax Court found the amount of records overwhelming and ordered the Slys to work with the IRS to organize the record in a manner that would help with the disposition of their case. *Id.* The Slys failed to comply with the order and the Tax Court entered a default order against them as a sanction. *Id.* Pursuant to the default order, the Tax Court held that the IRS met its burden to establish the amount of the Slys' tax deficiencies. *Id.* It further held that the IRS' allegations regarding tax fraud were deemed admitted by the Slys. *Id.* The Slys did not appeal the default order entered against them.

The Slys filed a chapter 11 bankruptcy case in this Court on April 30, 1990. It was converted to a chapter 7 case and the debtors received a discharge on March 3, 1993. Subsequently, the IRS informed the Slys of its position that their 1980 through 1983 tax liabilities were not affected by the discharge. Mr. Sly replied that it was the Slys' position that their taxes were discharged. He continued to correspond with IRS representatives regarding his tax debts over the next few years; however, the parties did not reach a resolution. Neither party filed a dischargeability action at that time.

The Slys filed an adversary proceeding seeking to determine the dischargeability of their federal income tax debts on June 7, 2001. They argued that their 1980 through 1983 tax liabilities were discharged by their chapter 7 bankruptcy case. The IRS argued that the Slys' tax liabilities were excepted from discharge under the Bankruptcy Code. Both parties filed summary judgment motions regarding the preclusive effect of the prior Tax Court cases in which the Slys were involved. This Court denied both motions. *In re Sly,* 280 B.R. 261 (Bankr.N.D.Fla. 2002). The IRS filed a second summary judgment motion based on the doctrine of laches and the postpetition assessment of the Slys' 1983 taxes. *In re Sly,* 305 B.R. 67, Case No. 90–04377, Adv. No. 01–80025, 2003 WL 22871728 (Bankr.N.D.Fla.2003). The Court denied the IRS' motion on its laches argument but granted its motion as to the 1983 taxes. A trial regarding the dischargeability of the taxes due for the remaining years, 1980 through 1982, was held on November 3, 2003.

## LAW

█ In this case, the Court must consider only whether the Slys' 1980 through 1982 federal income taxes are excepted from discharge under § 523(a)(1)(C) of the Bankruptcy Code. The amount of the Slys' tax liabilities for the years in question has already been determined by the United States Tax Court. It is inapposite for issue preclusion purposes that the tax lia-

bilities were determined pursuant to a default order because bankruptcy courts are barred from relitigating the amount of a debtor's tax liabilities under § 505(a)(2)(A) of the Bankruptcy Code. *Baker v. Internal Revenue Service,* 74 F.3d 906 (9th Cir. 1996).

 Section 523(a)(1)(C) excepts from discharge any debt for a tax "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). Under § 523(a)(1)(C), there are two alternative prongs by which a tax debt may be excepted from discharge. The first prong excepts from discharge any tax debt for which the debtor made a fraudulent tax return; the second any tax debt for which the debtor willfully attempted to evade or defeat in any manner. *Koehl v. United States (In re Koehl),* 166 B.R. 74, 79 (Bankr.E.D.La.1993). The IRS bears the burden to prove that the Slys' tax debts should be excepted from discharge under either prong of § 523(a)(1)(C) by a preponderance of the evidence. *United States v. Fretz (In re Fretz),* 244 F.3d 1323, 1327 (11th Cir.2001). The Court will consider the dischargeability of the tax debts of Dona Sly and Joann Sly separately below.

## DONA SLY

### A.

The first prong of § 523(a)(1)(C) excepts from discharge any tax debt for which the debtor made a fraudulent tax return. 11 U.S.C. § 523(a)(1)(C). In determining whether a debt is excepted from discharge under the first prong, "[c]ourts have analogized it to the civil fraud penalty under the Internal Revenue Code, 26 U.S.C. § 6663."

*Berkery v. Commissioner,* 192 B.R. 835, 841 (E.D.Pa.1996)(citing to *McKay v. United States,* 957 F.2d 689 (9th Cir. 1992)). Under this analogy, the IRS must prove that the debtor violated 26 U.S.C. § 6663 (the civil tax fraud section) for the tax debt to be excepted from discharge.[4] *Berkery* at 841.

 Like other forms of fraud, tax fraud must often be proved by circumstantial evidence because "direct proof of fraud is rarely available." *Berkery* at 841. Courts have developed "badges of fraud" to identify fraudulent activity. These badges include "large understatements of income made consistently over time; failure to keep adequate records; failure to file tax returns; implausible or inconsistent behavior by the taxpayer; concealing assets; and failure to cooperate with taxing authorities." *Id.* (citing to other similar cases). Courts also consider "the relative sophistication of the debtor." *Id.*

 The Slys founded Universal in 1975 after attending other churches but not finding any one that completely accorded with their religious beliefs. Universal began with only 4 members: the Slys and one other couple. Shortly after Universal was founded, its members elected Mr. Sly as pastor. Mr. Sly applied, on Universal's behalf, for tax exempt status with the IRS. The IRS granted Mr. Sly's request effective May 1, 1975 based on the purpose stated in Universal's tax exemption application and as well as subsequent information requests. That purpose, according to Universal, was to operate a church and conduct services.

Consistent with its tax exemption application, Universal conducted services typically associated with churches, such as Bi-

---

**4.** Although *McKay* states that the IRS must prove that the debtor violated 26 U.S.C. § 6653(b), that section was amended in 1989 and the tax fraud provisions were moved to 26 U.S.C. § 6663. *Berkery* at 841 n. 7.

ble studies, weddings, and funerals. However, it also served as a conduit through which at least four commercial businesses were operated. These businesses were considered to be departments of Universal and they were operated almost exclusively by Mr. Sly. They included a debt collection agency, a magazine subscription service, a bureau to distribute information about local businesses, and an insurance business. The IRS was not aware that Universal was operating any of these businesses. It periodically sent questionnaires to Universal regarding its activities but Universal did not indicate that it was operating any businesses. The IRS became dissatisfied with Universal's responses to its questionnaires and conducted an investigation into Universal's activities. On December 16, 1981, the IRS retroactively revoked Universal's tax exempt status to May 1, 1975.

The Slys received income from the businesses operated by Universal but did not report the income on their taxes. The largest of these businesses was the Bureau of Collections Department. Mr. Sly originally operated Collection as a nonexempt Tennessee corporation before transferring it to Universal. After Collection was transferred to Universal, Mr. Sly claimed that it was tax exempt even though its operations after the transfer did not undergo any meaningful change. Mr. Sly testified that he viewed the activities differently (mediation instead of pressure collection) but the manner of operation was very similar. The result was the same too. If there was collection, the business received a fee. The Court finds that Mr. Sly is a relatively sophisticated business man. Therefore, even though Mr. Sly testified that he believed the income generated by Universal's businesses was tax exempt, the Court is not persuaded by his testimony. The business was not closely tied to Universal's activities and was operated to generate income. The first badge of fraud, large understatements of income consistently over time, is satisfied as to Mr. Sly.

Mr. Sly attempted to keep accurate records of Universal's activities. The volume of records retained by Mr. Sly and Universal was so great, in fact, that the Tax Court ordered the Slys to organize them into a more manageable form. The Court finds that the second badge of fraud, failure to keep adequate records, is not satisfied as to Mr. Sly.

The Slys filed personal federal income tax returns every year. Mr. Sly testified that he always filed the Slys' returns and the IRS did not dispute this; it only disputed the accuracy of the returns. The Court finds that the third badge of fraud, failure to file tax returns, is not satisfied as to Mr. Sly.

The Slys did not file tax returns on behalf of Universal nor did they list the income they received from the businesses Universal operated on their 1980 through 1982 tax returns. Mr. Sly testified that he understood that Universal was not required to file tax returns. However, this does not explain why the Slys failed to list the income they received from Universal on their personal income taxes. If they did in fact believe that the income they received from Universal was tax exempt, they could have listed it as income and taken an exemption for the entire amount. The Court finds that the fourth badge of fraud, implausible or inconsistent behavior by the taxpayer, is satisfied as to Mr. Sly.

Mr. Sly sold the Bureau of Collections, Inc. to Universal for $1.00 after its license to operate as a debt collection agency was revoked by the Tennessee Collection Service Board in 1974. After the sale, Mr. Sly claimed that Collection's profits were tax exempt as part of Universal. Although the transfer would appear to have little

value to Universal because Collection's license had been revoked, Mr. Sly continued to operate Collection in virtually the same manner as he had before the transfer. The Court finds that Collection's value, at least to Mr. Sly, was greater than the amount for which he sold it. The fifth badge of fraud, concealing assets, is satisfied as to Mr. Sly.

After the IRS initially granted tax exempt status to Universal in 1975, it periodically sent questionnaires to Universal to determine if it continued to meet tax exempt standards. The IRS found Mr. Sly's response to a December 28, 1977 questionnaire inadequate and sent a more detailed questionnaire to Mr. Sly on May 4, 1978. Mr. Sly's response indicated that he believed Universal's constitutional rights were being violated by the IRS. He questioned the IRS' authority and reasons for asking the questions but subsequently permitted an IRS agent to inspect Universal's records after he was served with a summons. Mr. Sly also failed to comply with a Tax Court order requiring him to cooperate with the IRS to organize the evidence in his case. Subsequent to the Slys' Tax Court cases however, Mr. Sly demonstrated a willingness to work with the IRS while maintaining his belief that his tax debts were discharged in the Slys' chapter 7 bankruptcy case. The Court finds that Mr. Sly's unwillingness to cooperate with the IRS when it made periodic inquiries into whether Universal continued to meet tax exempt status satisfies the sixth badge of fraud, failure to cooperate with taxing authorities. However, this factor is mitigated by Mr. Sly's post–1980 behavior; it is not heavily in the IRS' favor.

■ Courts considering the badges of fraud to determine whether a debtor has filed fraudulent tax returns have held that "no one factor is determinative" because courts should base their decision on the "totality of the circumstances." *United States v. Sternberg,* 229 B.R. 238, 246 (S.D.Fla.1998)(citing to *In re Greene,* 207 B.R. 21, 25 (Bankr.M.D.Fla.1997)). Therefore, "[w]hile a single badge of fraud may only amount to a suspicious circumstance, a combination of them will justify a finding of fraud." *Id.* This Court has considered 6 badges of fraud to determine if the Slys filed fraudulent tax returns. Four of the badges were satisfied and two were not.[5] The Court finds that the four badges of fraud that were satisfied—large understatements of income consistently over time, implausible or inconsistent behavior by the taxpayer, concealing assets, and failure to cooperate with taxing authorities are significant indicators of fraud when considered as a group. Accordingly, the Court finds that Mr. Sly's 1980 through 1982 tax debts are excepted from discharge under § 523(a)(1)(C) of the Bankruptcy because they filed fraudulent tax returns.

### B.

The Court has found that Mr. Sly's 1980 through 1982 tax debts are excepted from discharge under the first prong of § 523(a)(1)(C) because they filed fraudulent returns. Nonetheless, the Court will also consider whether Mr. Sly's tax debts are excepted from discharge under the second prong as well. The second prong of § 523(a)(1)(C) excepts from discharge any tax debt that the debtor "willfully attempted in any manner to evade or defeat . . . ." 11 U.S.C. § 523(a)(1)(C).

**5.** One of the 4 badges satisfied, failure to cooperate with taxing authorities, was mitigated by Mr. Sly's subsequent conduct.

■ The Eleventh Circuit Court of Appeals has held that "[t]he plain language of the second prong of § 523(a)(1)(C) contains a conduct requirement (that the debtor 'attempted in any manner to evade or defeat [a] tax'), and a mental state requirement (that the attempt was done 'willfully')". *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1327 (11th Cir.2001). The Court will consider each of these requirements separately.

### 1.

■ The conduct requirement of § 523(a)(1)(C) uses the phrase "in any manner" to avoid defining or limiting the "methods by which a willful attempt to defeat and evade might be accomplished." *Fretz* at 1327. The Eleventh Circuit Court of Appeals has defined "in any manner" to include "attempts to evade or defeat a tax whether accomplished by 'acts of culpable omission [or] acts of commission.'" *Id.* at 1329.

■ The Court finds that Mr. Sly committed both acts of culpable omission and acts of commission. When the Slys founded Universal, Mr. Sly applied for tax exempt status with the IRS. On Universal's tax exemption application, Mr. Sly stated that Universal's purpose was to operate a church and conduct services. However, Universal soon began operating 4 commercial businesses that generated income for the Slys. Mr. Sly did not seek amendment of Universal's tax exempt status to include these businesses nor did he cooperate with the IRS when it periodically sent questionnaires to Universal to determine if it continued to meet tax exempt requirements.

Additionally, Mr. Sly sold a profitable business, the Bureau of Collections, Inc., to Universal for $1.00. The transfer would appear to have little market value to Universal because Collection's license had been revoked; however, Mr. Sly ignored the revocation and continued to operate Collection in virtually the same manner as he had before the transfer. The Court finds that Mr. Sly transferred Collection to Universal to thwart the revocation of its license and to avoid paying taxes on its profits. The conduct requirement of the second prong of § 523(a)(1)(C) is satisfied as to Mr. Sly.

### 2.

■ The mental state requirement of the second prong is satisfied if the debtor's attempt to avoid his tax liabilities is "done voluntarily, consciously or knowingly, and intentionally." *Fretz* at 1330. Therefore, the IRS is only required to prove that Mr. Sly: "(1) had a duty to file income tax returns and pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty." *Id.* The third factor is the most important of the three part test. It "prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate." *Id.*

Mr. Sly testified that he knew he had a duty to file tax returns and pay his taxes. He testified that he did not know he had to file tax returns and pay taxes on income the Slys received from Universal because he believed that income was tax exempt. The Court is unpersuaded by Mr. Sly's testimony. Mr. Sly was a relatively sophisticated businessman who operated various commercial businesses before and after founding Universal. One of those businesses was the Bureau of Collections, Inc., which Mr. Sly sold to Universal. Mr. Sly had been operating Collection without tax exempt status prior to selling it Universal but he claimed that its profits were tax exempt after the transfer.

The Court finds that Mr. Sly's failure to pay taxes on the income he received from Universal was not an "inadvertent mistake." *Fretz* at 1330. Mr. Sly founded a church with only 4 members and although he testified that its purpose was to provide religious services, the Tax Court found that its purpose was to provide the Slys with income. Mr. Sly knew that the IRS questioned Universal's tax exempt status but he refused to cooperate with the IRS. He provided inadequate responses to IRS questionnaires and later refused to cooperate with an IRS agent sent to investigate Universal's records. His cooperation only came after he was served with a summons. The Court finds that Mr. Sly's actions were voluntary and intentional. The willfulness requirement of the second prong of § 523(a)(1)(C) is satisfied. Mr. Sly's 1980 through 1982 tax debts are excepted from discharge under § 523(a)(1)(C) because he willfully attempted to evade or defeat their tax liabilities.

## JOANN SLY

The Court has found that Mr. Sly's 1980 through 1982 tax debts are excepted from discharge under § 523(a)(1)(C) of the Bankruptcy Code because he filed fraudulent tax returns and he willfully attempted to evade or defeat a tax. It is a general rule that "liability is joint and several for tax, interest, and penalties due with respect to a joint return." *Dube v. United States (In re Dube)*, 169 B.R. 886, 894 (Bankr.N.D.Ill. 1994). However, "[t]he issue before this Court is a determination of dischargeability of a debt pursuant to § 523 and not a determination of tax liability pursuant to 11 U.S.C. § 505." *Kirk v. United States (In re Kirk)*, 98 B.R. 51, 54 (Bankr. M.D.Fla.1989). Therefore, the Court will consider whether Ms. Sly's 1980 through 1982 tax debts are also excepted from discharge.

Mr. Sly's fraudulent activities cannot be imputed to Mrs. Sly for § 523(a)(1)(C) dischargeability purposes. *Kirk* at 54. Just as it did with Mr. Sly, the IRS bears the burden to prove that Mrs. Sly's tax debts should be excepted from discharge under either prong of § 523(a)(1)(C) by a preponderance of the evidence. *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1327 (11th Cir.2001). However, the Court will not examine both prongs because it finds that the IRS failed to prove that Mrs. Sly made a fraudulent return or willfully attempted in any manner to evade or defeat a tax.

The Court observed Mrs. Sly at trial. She was not a sophisticated businesswoman. Mrs. Sly professed little knowledge of the business transactions of Universal. She spent most of her time raising foster children, caring for the elderly, visiting the sick and running her household and small beauty shop. Mrs. Sly testified that she knew Mr. Sly received income from Universal and that Universal paid bills on the Slys' behalf. However, she stated that she was not involved in Universal's commercial businesses and she merely signed the Slys' joint tax returns.

Although Mrs. Sly testified that she voted on some issues brought up in Universal's meetings, the IRS did not show by a preponderance of the evidence that Mrs. Sly participated in any of Universal's activities in a way that sought to avoid a tax. Without more evidence, the IRS did not meet its burden of proof as to Mrs. Sly's actions and knowledge. The Court finds that Mrs. Sly did not file fraudulent tax returns for the years 1980 through 1982

## CONCLUSION

The tax debts of Mr. Sly are excepted from discharge pursuant to § 523(a)(1)(C) of the Bankruptcy Code. The IRS proved

that Mr. Sly's tax liabilities should excepted from discharge under both prongs of § 523(a)(1)(C) by a preponderance of the evidence.

The tax debts of Mrs. Sly are not excepted from discharge pursuant to § 523(a)(1)(C). The IRS failed to prove that Mrs. Sly's tax liabilities should be excepted from discharge under either prong of § 523(a)(1)(C) by a preponderance of the evidence.

It is ORDERED that the 1980 through 1982 federal income tax debts of Dona Sly are excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C) and that the 1980 through 1982 tax debts of Joann Sly are discharged.